McINTOSH *v.* FIXEL.

1. BANKRUPTCY—RATIFICATION OF CONTRACTS—CANCELLATION OF INSTRUMENTS—ESTOPPEL.

After contract to purchase a cooperage plant had been ratified by acts of corporate purchaser both before purchaser was involved in bankruptcy proceedings and afterwards by trustee in reorganization proceedings under the bankruptcy law and the trustee subsequently engaged in liquidating the assets, by taking possession of the property, asserting the right to sell it, and receive rentals therefrom, the latter trustee would not be entitled to have the contract cancelled for alleged fraud on the part of purchaser's officers and attorneys since the trustee is estopped (11 USCA, § 207).

2. CONTRACTS—RESCISSION—STATUS QUO—CANCELLATION—EQUITY.

One seeking rescission of a contract must first place the other party *in statu quo* and if that cannot be done, a court will

grant relief by way of cancellation only where the clearest and strongest equity imperatively demands it.

3. SAME—FRAUD—DELAY—RESCISSION—DAMAGES.

As a general rule a defrauded party who delays and accepts the benefits of a contract cannot thereafter rescind, his remedy being an action for damages.

4. BANKRUPTCY—BONUS OF STOCK—FRAUD—MEASURE OF DAMAGES.

In suit by trustee in bankruptcy of a corporation to set aside a transaction whereby defendants improperly received a bonus of stock for furnishing a part of the purchase price of cooperage plant the corporation had purchased on land contract, incident to which defendants agreed not to offer such stock for sale for a certain period, and such agreement was performed so that sale of stock by the corporation was not interfered with, trustee would not be entitled to damages measured by par value at time defendants acquired the stock as damages are compensatory only.

5. SAME—ATTORNEY AND CLIENT—EQUITY—ISSUANCE OF STOCK IN VIOLATION OF ORDER OF CORPORATION AND SECURITIES COMMISSION.

Transaction wherein defendant attorneys for corporation, whose trustee in bankruptcy is plaintiff herein, acquired a cooperage plant on land contract for $18,000 and immediately sold it to corporation for $35,000, $15,000 of which was paid by issuance of treasury stock, would not be sustained in a court of equity where it operated to violate order of corporation and securities commission providing that no stock should be issued for promotion and other intangibles without first securing commission's approval, such approval was not obtained, and the transaction was in violation of attorney and client relation then existing between corporation and defendant attorneys.

6. ATTORNEY AND CLIENT—FIDUCIARY RELATION—BURDEN OF PROVING CLIENT FREE FROM RESTRAINT.

In dealings between attorney and client, the attorney has the burden of showing the client has full information and freedom from restraint and, if he cannot produce evidence which puts the transaction beyond reasonable controversy, it will be set aside and he will be regarded as trustee for his client.

7. BANKRUPTCY—ATTORNEY AND CLIENT—BURDEN OF SHOWING FULL DISCLOSURE—ATTORNEY AS TRUSTEE.

In suit by trustee in bankruptcy to set aside transaction whereby attorney for bankrupt corporation purchased a cooperage plant and immediately turned around and sold it to corporation at a

greatly increased price, taking option on stock in part payment, where authority to issue corporate stock was accompanied by direction that no stock could be issued for promotion or intangibles without approval of corporation and securities commission and attorney failed to meet his burden of showing full disclosure to corporation, he will be treated as trustee for it.

8. Same—Sale of Property of Estate Claimed by Others.

In suit by trustee in bankruptcy to set aside transaction between corporation and its attorney, trial court properly refrained from requiring plaintiff to account to defendant for amount received from sale of personal property which was found to have formed a part of defendant's security, in view of the bankruptcy act giving the bankruptcy court power to sell only the estate of the bankrupt.

9. Costs—Appeal by Both Parties.

No costs are allowed in suit where both parties appeal and decree is affirmed.

Appeal from Wayne; Miller (Guy A.), J. Submitted January 17, 1941. (Docket No. 108, Calendar No. 41,420.) Decided April 8, 1941.

Bill by Julian G. McIntosh, trustee of the estate of Plymouth Cooperage Corporation, a Michigan corporation, debtor, against Rowland W. Fixel and others to cancel a land contract, to compel a conveyance, for an injunction and other relief. Cross bill by Rowland W. Fixel individually and Rowland W. Fixel and others as testamentary trustees of the estate of Bertha Fixel, deceased, against plaintiff for an accounting. From decree entered, plaintiff appeals and defendants cross-appeal. Affirmed.

*Beckenstein, Wisok & Maguire* (*Robert S. Wisok* and *Marvin M. Peck,* of counsel), for plaintiff.

*Henry B. Graves,* for defendants Fixel.

*Frank Sibley,* for defendant Hoehn.

Chandler, J. The Plymouth Cooperage Company was organized under the laws of this State some time during the early part of the year 1934 for the purpose of engaging in the business of the manufacture of beer barrels. H. Armin Weil and Harry Freshman were the promoters, Mr. Weil and members of his family being the principal stockholders.

The Plymouth Company acquired the assets of the Wolverine Wood Products, Inc., of Ann Arbor, moved the same to Plymouth and engaged in the business of the manufacture of beer barrels and the sale of its capital stock.

The business was far from profitable and stock sales moved very slowly. Messrs. Weil and Freshman conceived the idea that the manufacture of whisky barrels offered a more lucrative field for the business of the company, but the Plymouth plant was not suitable for that purpose. They procured some orders for whisky barrels and temporarily arranged for the manufacture of the same in Paducah, Ky. The promoters finally found a cooperage plant at Cleveland, Ohio, owned by one Welti, which they considered suitable for the business of the company. They ascertained that the plant could be purchased for $18,000, but that the conditioning and equipment of the same to meet their requirements would necessitate an additional expenditure of several thousand dollars. They then realized that more capital would be required than could be obtained under the original authorization of the securities commission, and in the latter part of 1935 application was made to the commission for authority to sell an additional $100,000 of the capital stock of the Plymouth Company. On January 28, 1936, an order was entered by the commission validating the issue of 100,000 shares of additional stock at $1 per share to net the corporation not less than 85¢ per share, which order, among other provi-

sions, contained the following: "that no stock shall be issued for promotion or other intangibles without first securing the approval of this commission." No subsequent order was ever approved by the commission.

The law firm of McLeod, Fixel & Fixel, of which defendants Arthur E. Fixel and Rowland W. Fixel are members, were attorneys for the Plymouth Cooperage Company from October, 1934, through the years 1935 and 1936, Arthur handling the business for his firm until March, 1936, when Rowland took charge of its affairs because of other business and engagements occupying the time and attention of Arthur. Arthur in person represented the corporation in securing the order of the securities commission validating the last stock issue.

Arthur Fixel learned from Mr. Weil around the first of March, 1936, that the Cleveland plant could be purchased for $18,000 on the following terms: $8,000 in cash and a first mortgage on the plant for $10,000 payable in five years. Mr. Arthur Fixel testified:

"Weil then made the statement that the situation was getting to the point where they would have to do something, and he asked me if I didn't have parties of my acquaintance who could acquire this plant and put the Plymouth Cooperage Corporation in there, either on a lease basis or a land contract basis without an immediate down payment on a deferred basis. Mr. Freshman stated to me in Mr. Weil's presence, he said we could afford to give somebody 15,000 shares of our stock who would buy the plant and sell it to us that way on a deferred basis so we could get in there and manufacture our orders."

On or about March 12, 1936, Mr. Rowland Fixel went to Cleveland with Mr. Weil and further negotiations were had with Welti, the owner of the Cleve-

land plant, on a rental basis. However, these came to naught. Mr. Welti refused to consider any proposition other than an out and out sale for $18,000, $8,000 cash and a five-year purchase-money mortgage for the balance. Upon his return to Detroit, Rowland advised Arthur of what had transpired at the Cleveland conference.

The record discloses that Arthur Fixel contacted several business acquaintances endeavoring to find one who would advance the sum of $8,000 cash to enable the corporation to acquire the Cleveland plant, but without success until he contacted defendant William Hoehn who agreed to contribute $4,000 of the cash necessary for the purchase. It was then that Rowland and Arthur Fixel and their brother William, as trustees of the estate of Bertha Fixel, deceased, undertook and agreed to contribute the other $4,000 of the cash necessary to apply on the purchase price.

At the time of the transaction hereafter detailed, Rowland W. Fixel executed a declaration of trust to defendant Hoehn setting forth that his only interest in the property acquired from Welti was as trustee for said Hoehn and, as a part of the same transaction, defendant Hoehn executed a declaration of trust declaring himself to be holding said property in equal shares for himself and the estate of Bertha Fixel, deceased. These mutual declarations were evidently made prior to the time that Rowland Fixel went to Cleveland to consummate the deal with Welti.

On or about April 2, 1936, Welti conveyed the legal title of the Cleveland property to Rowland W. Fixel, "trustee," and was paid $8,000 in cash and received back from Mr. Fixel a purchase money mortgage for the sum of $10,000, payment of which was later guaranteed by the Plymouth company.

Mr. Rowland Fixel then entered into a contract with the Plymouth company by which he agreed to sell to it the property in question for the total purchase price of $35,000, $10,000 to be paid in cash, $10,000 by the assumption of the purchase-money mortgage, and the remaining $15,000 within one year of the date of the contract, either in cash, or in stock at par, at the option of the vendor. $2,000 was repaid to the trustee, and in July of the same year this option was exercised by the "trustee" and stock was taken in lieu of cash. This 15,000 shares of stock was distributed as follows: 4,500 to the defendant Hoehn, 4,500 to the estate of Bertha Fixel and the remaining 6,000 shares was transferred to one Edlin whom the record discloses was under contract with the company to sell 60,000 shares of its stock, and who demanded and received from Rowland, "trustee," and Hoehn the transfer of this stock. However, it does not appear from the record that either Mr. Hoehn, the estate of Bertha Fixel, or Rowland W. Fixel, "trustee," received any consideration whatever for the transfer of this stock, or what, if any, disposition ever was made by said Edlin of said stock; neither does the record disclose that said Edlin ever made any transfer of his stock, and we therefore do not consider Edlin's connection with the corporation, or any of the defendants, as of any importance as said stock is now of no value. In this connection it might be said that both Edlin and Weil were at the time of the hearing of this cause under indictment in the Federal court because of irregularities in their conduct in connection with affairs of the company.

Defendant Hoehn has never disposed of any of his stock and still holds the entire 4,500 shares. The estate of Bertha Fixel has disposed of 4,000 shares and realized upon the sale thereof the sum of

$1,457.72. These sales of stock on the part of the Bertha Fixel estate took place in November and December, 1936, and January, 1937. The record discloses that the testamentary trustees of the estate of Bertha Fixel and Mr. Hoehn agreed with the officers of the corporation not to offer for sale any of their stock for four or five months, so that there might not be any interference with the sale of the treasury stock of the company. There is nothing in the record to indicate that the sale of this 4,000 shares of stock by the Bertha Fixel estate in any way interfered with the sales of stock that the corporation was undertaking to make, as only 154,000 shares of stock, in addition to the 15,000 shares issued to the Fixels and Hoehn, was issued out of an authorization of 177,000 shares.

On December 17, 1936, defendant Rowland W. Fixel as "trustee" and the Plymouth Cooperage Corporation as lessors leased the Cleveland plant to one Green, and rentals as appears from the record have been collected by the trustee in bankruptcy in the amount of $1,228.62.

On March 12, 1937, involuntary proceedings were commenced against the Plymouth company in the United States district court for the eastern district of Michigan under section 77B of the national bankruptcy act (11 USCA, § 207), one Rosenburg being first appointed temporary trustee and being succeeded as permanent trustee by the plaintiff in the instant case. Reorganization proceedings having failed, on June 28, 1937, the bankruptcy court made an order to liquidate the estate. Under an order of the bankruptcy court, the plaintiff herein sold the personal property in the Cleveland plant, realizing therefrom the sum of $450.

On April 11, 1938, the instant suit was commenced, by direction of the bankruptcy court, in

Wayne county circuit court in chancery by the trustee, making Rowland W. Fixel, individually; Rowland W. Fixel, Arthur E. Fixel, and William A. Fixel, testamentary trustees of the estate of Bertha Fixel, deceased; William H. Hoehn; H. Armin Weil, and Harry Freshman, defendants. Neither Weil nor Freshman were ever served with process in this suit. The bill of complaint alleged fraudulent conduct on the part of defendants Fixels, Weil and Freshman, and alleged that defendant Hoehn had notice of the fraudulent character of the transaction by which the Fixels, as testamentary trustees of their mother's estate, and himself were to receive 15,000 shares of the stock of the Plymouth company as a bonus or profit for the furnishing of $8,000 towards the purchase price of the Cleveland plant. It is plaintiff's claim that the firm of McLeod, Fixel & Fixel, with whom defendants Rowland and Arthur Fixel were connected, were attorneys for the Plymouth company during the time the transactions above related were going on; that they occupied a fiduciary relation toward the company; and that no full and complete disclosure of all the facts connected with this transaction was ever made to the corporation or to the stockholders thereof; that the transaction was one that was improper to be carried on between attorney and client; that said attorneys well knew of the provision of the order of the securities commission limiting the sale of the stock for certain purposes, and fixing a minimum sum for which said stock should be sold; that the defendants Fixel and Hoehn must be held as trustees *ex maleficio* for all damages sustained by the company growing out of the transaction. The plaintiff contends that these damages are to be computed as follows: Defendants are to be credited with $8,000 which they contributed, and are to be charged with

$15,000 as the cash value of the stock which was transferred to them in July, 1936.

On the other hand the defendants contend that their dealing with the company in connection with the transaction in which the Cleveland plant was acquired was a business deal conducted at arm's length between them and the company. They deny that there was any fraud or overrreaching on their part and assert that they are entitled to a lien upon the Cleveland property next after the purchase-money mortgage for the amount of $8,000, which they advanced for the corporation, plus interest thereon, and also claim the right to recover from plaintiff as trustee in bankruptcy the sum of $450, which was received by him on the sale of the personal property referred to, which they claim was a part of their security in this transaction. They deny that they should be charged in any way with the proceeds of the stock which they have sold and deny that the transaction either can be or should be cancelled and set aside.

It was upon these conflicting claims that the case was submitted to the trial judge.

The trial judge made findings of fact and conclusions of law. He found that the relation of Rowland and Arthur Fixel to the affairs of the company was clearly that of attorney and client; that the issuance of $15,000 of treasury stock in connection with the transaction hereinbefore detailed was never called to the attention of the securities commission, and concluded that if it had been, it would never have been approved by that commission. The court found that the connection of defendants Weil and Freshman with the transaction and subsequent false entries in the books of the corporation disclosed that a distinct fraud was perpetrated upon the company by them, but that the defendants Fixel were not connected therewith, but as a conclusion

of law determined that the Fixels must be charged with all the legal consequences which flow from the circumstances of the contract and its wording, and from the order of the securities commission; that they are chargeable with the consequences of the conclusion that the transaction was not in accordance with the terms of the order of the securities commission, and that the transaction was one which should not be sanctioned by a court of equity.

The trial court determined that the contract in question could not be cancelled by said court because of its ratification by the acts of the corporation and the trustees in bankruptcy, saying:

"There have been two trustees, one under that section of the Federal statutes known as 77-B, and one under the general bankruptcy law. Both have been in possession of the property, have asserted the right to sell personal property covered by the contract in question, and have received considerable sums by way of rental of a part of the premises covered thereby. Both have appeared in the Federal court in bankruptcy, asking the direction of that court to sell both the personal property and the real estate under the authority of the district court for the eastern district of Michigan, southern division, in bankruptcy, free and clear of any and all claims and liens other than the lien of the purchase-money mortgage given back to Welti at the time of the original purchase. This course of conduct of the trustee, acting under the authority of the Federal court, conclusively establishes a ratification of the contract, and conclusively prevents and estops the plaintiff in this case from claiming any cancellation thereof."

Relative to plaintiff's contention on the question of damages, the trial court said:

"The plaintiff in the case claims the right to charge the defendants $15,000 for 15,000 shares of

stock at par because those 15,000 shares of stock were taken in lieu of a cash claim for $15,000. The plaintiff claims the right to do this on the basis that the corporation was damaged to an amount of $15,000 when its treasury stock was issued. This claim does not seem to be sustained. In the first place the true theory upon which such proceedings should rest is that where one acting under a fiduciary capacity profits unjustly out of his fiduciary relationship that unjust enrichment should be taken away from him and his beneficiary should receive the benefit thereof, whatever that benefit has been. That theory does not proceed upon compensation for damages inflicted or sustained but it does proceed truly and correctly upon a trust principle and that is that a trustee shall not be permitted to profit or benefit by derelictions in his duty as trustee. Under the theory of damage the argument of the plaintiff would result in a rather anomalous position. If the stock had gone to a value of $2 per share and the corporation had been a success, the only recovery that could be made by the corporation in such a case would be $1 per share, which is all that the company was entitled to gain out of the sale of its treasury stock. Therefore, the trustees would be charged with $15,000 and they would be allowed to retain $15,000 for their own enrichment which they wrongfully obtained as the fruits of a violation of their duties in a fiduciary capacity. Such a conclusion as that is distinctly contrary to the rules of morality and also to the rules of law as I understand them. Under such circumstances if the stock were still retained by the fiduciary a decree would certainly be rendered by any court of equity cancelling the stock in their hands and ordering its return to the treasury of the corporation, regardless of what its value might be. It must be concluded that the basis of a decree in such a matter is properly the unjust enrichment which has been gained and not the damage which has been suffered. If recovery

were to be based upon damage, it is conceivable that even though there is great enrichment of a fiduciary there might not be any damage to the beneficiary. In such a case the fiduciary would be allowed to retain whatever he has enriched himself by and the beneficiary would not be allowed to cancel the transaction.

"Furthermore, it is not perceived in this case that there is any basis for figuring any loss on the part of the corporation. It has not lost the sale of any of its treasury stock open for sale, because at the time when the sale ceased there was still a considerable amount of authorized treasury stock unsold. The contention of the plaintiff in this regard cannot be sustained."

The court below then solved the issues involved in this case as follows:

"As already stated, there can be no cancellation. The relation of vendor and vendee still exists as between Rowland Fixel, trustee, and the company. The estate of Bertha Fixel and William Hoehn have $8,000 in cash which is invested in the property. They are entitled to the return of this $8,000 cash, which can be returned to them only by a decree declaring that they have a lien upon the land in Ohio which is subsequent to the lien of the purchase-money mortgage but is ahead of any claim in behalf of the trustee in bankruptcy. The contract still being in existence, they are entitled under its terms to the benefit of interest upon the $8,000, with which they must be credited. The estate of Bertha Fixel must be charged with $1,457.72 as the proceeds of the sale of stock which was transferred to that estate. The stock in the hands of the defendant William Hoehn, 4,500 shares, must be cancelled. The evidence in the case shows that 6,000 shares of stock were transferred to Edlin and he is not a party defendant to this proceeding. Therefore, nothing can be done in the way of cancelling the stock in his

hands. If he ever comes before any court and if the question ever becomes of any importance, then it is probable that that stock would also be subject to cancellation in his hands. It cannot be done by a decree in this case, however.

"The claim is made that the rentals received by the trustee in bankruptcy should be properly credited to Fixel, trustee. This cannot be done in view of the fact that interest is allowed upon the $8,000 of the unpaid purchase price under the contract. The vendee in the contract has at all times been entitled to the possession of the land until proper steps have been taken to foreclose the contract. * * * As long as the relationship of vendor and vendee continued and the right to possession of the property was not legally changed, the vendor is entitled to insist upon the unpaid part of the purchase price, and the vendee is entitled to the use of the property and the collection of the rentals."

A decree was entered in accordance with the foregoing findings and conclusion reached by the trial court, from which decree all parties appeal.

The trial court in the opinion filed in addition to the findings hereinbefore enumerated determined that the $450 received by the plaintiff from the sale of personal property, that was a part of the Cleveland plant, was a part of defendants' security and that Rowland W. Fixel, trustee, was entitled to receive said sum to apply on the amount of indebtedness due from the bankrupt to him. However, in the decree finally entered in said cause, no provision was made for the disposition of this money so received.

The plaintiff contends:

1. That the trial court was in error in holding that the plaintiff was estopped from claiming a cancellation of the contract in question because the acts

of the corporation and trustees clearly showed a ratification thereof.

Being in accord with the determination of this question by the circuit judge, as well as the views thereon expressed by him as hereinbefore quoted, we adopt his opinion on this question as determinative of the issue here presented by plaintiff. The rule is quite uniform that one who seeks rescission of a contract must first place the other party *in statu quo*. If this cannot be done, the court will grant relief by cancellation only where the clearest and strongest equity imperatively demands it. The facts in the instant case do not create any demand for the invocation of such doctrine.

As a general rule a defrauded party who delays and accepts the benefits of a contract cannot thereafter rescind, his remedy being an action for damages.

Plaintiff further contends:

2. That the trial court erred in failing and refusing to charge defendants with the par value and/or full value as of the date of transfer of the treasury stock of the company taken by defendants upon the exercise of the option contained in the land contract.

We are not in accord with plaintiff's position. The only theory on which such a determination could be made would be that plaintiff had sustained damages to an amount equal to the par or market value of the so-called bonus stock at the time of the transfer of the same to defendants. Damages are compensatory only. From the record it clearly appears that had this stock remained in the treasury of the corporation, it was valueless because there still remained at the time of the bankruptcy several thousand shares of validated unissued stock, which the corporation had been unable to sell. It further

appears that defendants had kept their agreement with officers of the corporation not to offer their stock for sale for more than five months and had not, therefore, in any way, interfered with the sale of the stock of the company corporation.

Plaintiff urges:

3. That the trial court erred in holding that the plaintiff trustee in bankruptcy must pay to Fixel, trustee, the sum of $450 realized on the sale of the personal property held under order of the Federal court.

While the court made the finding here complained of, it was not incorporated in the decree. This subject will be discussed later herein.

Cross appellants contend in their statement of questions involved that the court was in error in holding that the deal by which defendant Rowland W. Fixel, trustee, acquired title to the Cleveland plant and in turn sold the same to the Plymouth Company by reason of the attorney and client relationship was not a good faith transaction and was in violation of the order of the Michigan securities commission and could not therefore be sustained by a court of. equity.

The trial judge on this phase of the case found:

"The conclusion is too obvious that the commission would never have authorized that contract when even a moment's consideration is given to the terms of the transaction. Property can be bought and is bought for $18,000. It is immediately resold to the company for $35,000, all of which can be required to be paid within not more than one year from the date of the making of the contract. A profit of 185 per cent. is provided for in 12 months on the deal. The attorneys for the corporation are on one end of that transaction. It cannot be held that such a transaction can be entered into between the attorneys for the corporation, subject to the jurisdiction of the securities commission, under such cir-

cumstances as to permit it to be regarded as a good-faith transaction entered into with full knowledge of all of the parties interested in the affairs of the company. This conclusion is further fortified by the fact that there is nothing in the records of the meetings of the board of directors to indicate that the original purchase price of the property was $18,000.''

This conclusion of the trial judge has our approval. See *Oviatt* v. *Smith,* 226 Mich. 253.

In dealings between attorney and client of this nature, we hold that the burden is upon the attorney to show full information and freedom from restraint on the part of the client and, if he cannot produce evidence which puts the transaction beyond reasonable controversy, it will be set aside and he will be regarded as trustee for his client. This burden has not been met by defendants Fixel, the attorneys, and Rowland W. Fixel must be regarded and treated as trustee for the Plymouth company.

The record here does not disclose that the board of directors of the Plymouth corporation had any information from President Weil or attorney Fixel that the original purchase price of the Cleveland plant was $18,000. The record also discloses that the issuance of 15,000 shares of bonus stock to defendants was clearly in violation of the order of the Michigan securities commission, which fact was known to the attorneys who represented the corporation at the time the second issue of stock was validated by the commission.

Cross appellants also insist that the court erred in not requiring, by its decree, the plaintiff to account to them for the sum of $450 received from the sale of personal property in the Cleveland plant.

As hereinbefore noted the trial judge found that this property was a part of defendants' security and that said sum should be accounted for by plaintiff to

defendants to apply on plaintiff's indebtedness to them. The decree as finally entered did not require any accounting from the plaintiff for said amount. No reason appears in the record as to why the court's finding in this respect was not made a part of the decree. However, we conclude that the reason therefor was because of the provisions of the bankruptcy act, which gives the bankruptcy court power to sell only the estate of the bankrupt. We call attention to 8 C. J. S. p. 1037, § 310.

"All that the trustee is authorized to sell is the bankrupt's right or interest in particular property, and he cannot guarantee the extent of such right nor will the court pronounce on it in advance. Where a bankruptcy court finds assets in its hands, which are claimed by a third party, it has the right, therefore, without disposing of the question of title to sell the bankrupt's interest therein, leaving the purchaser of such interest and the adverse claimant to contest their rights elsewhere."

We hold that the trial court was correct in not incorporating in the final decree any requirement by the plaintiff to account to defendants for the amount received by him from the sale of personal property.

Other issues raised by cross appellants have either been discussed by us in this opinion or by the trial court in the quotations from his opinion set forth herein, which meet with our approval and are made a part of this opinion.

The decree entered in this case is affirmed.

Following the suggestion of the trial court, who made no award of costs, excepting for the entry fee and decree fee, no costs will be awarded on this appeal.

Sharpe, C. J., and Bushnell, Boyles, North, McAllister, Wiest, and Butzel, JJ., concurred.