**Martin R. GOLDMAN, Plaintiff,**

v.

**BANK OF the COMMONWEALTH, a Michigan banking corporation, Defendant.**

**Civ. A. No. 33646.**

United States District Court, E. D. Michigan, S. D.

Oct. 13, 1971.

**700**

Bodman, Longley, Bogle, Armstrong & Dahling, by Michael Lewiston, Detroit, Mich., for plaintiff.

William Merrill, Detroit, Mich., for defendant.

## OPINION AND ORDER

KEITH, District Judge.

The plaintiff is a citizen and resident of the State of Michigan. The defendant is a Michigan Banking corporation organized and operating in and under the laws of the State of Michigan with its principal offices in Wayne County, Michigan. Plaintiff seeks to recover damages allegedly caused to him by reason of loans made to him by the defendant, which loans he alleges were made in violation of Regulation U [12 C.F.R. 221 (1968)] promulgated by the Board of Governors of the Federal Reserve System pursuant to § 7(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78g.[1] In addition, plaintiff seeks to recover damages allegedly caused to him by reason of loans made to him by the defendant, which loans he alleges are usurious under M.S.A. § 19.15(2), M.C. L.A. § 438.32. Regulation U has to do with the margin requirements for loans made for the purpose of purchasing or carrying registered securities. The defendant has filed a counterclaim, seeking to have the plaintiff pay the money due on the loan, and seeking damages for alleged misrepresentations made by the plaintiff to the defendant.

Jurisdiction is based on the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. Defendant is a member of the Federal Reserve System and is bound by and required to observe the rules and regulations promulgated by the Board of Governors of the Federal Reserve System.

Defendant is required to observe the Securities Exchange Act of 1934 (15 U.S. C.A. § 78a etc.,) and Regulation U promulgated by the Board of Governors of the Federal Reserve System.

Beginning on February 13, 1968, the defendant made to the plaintiff a number of loans. These loans were secured by registered securities. A number of these loans were made to the plaintiff individually and a number of these loans were made to the plaintiff and a Mr. Hermilin, jointly. The last loan was made on August 9, 1968. The loans which were actually in controversy are those which occurred between May 13, 1968 and August 9, 1968. The total amount of money which is due on the loans which occurred between May 13, 1968 and August 9, 1968, is approximately $661,000.00. The bank is presently holding the securities which were used as collateral for these loans and it appears that the securities have declined considerably in value since the original transactions.

§ 78g, Title 15 U.S.C.A., provides, in part, as follows:

"(a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall, prior to October 1, 1934, and from time to time thereafter, prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security * * *.

(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) On any security * * * in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsec-

---

1. The Court is relying on the Regulations in effect at the time of the transactions.

tions (a) and (b) of this section * * *.

(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section. * * *"

Paragraph (c) above set forth has to do with brokers and dealers. Paragraph (d) above set forth has to do with bank lenders.

Pursuant to the authority granted the Board of Governors of the Federal Reserve System Regulation U was promulgated. Regulation U governs the extension of credit by banks for the purpose of purchasing or carrying registered securities. The regulation prescribes a minimum margin requirement which has been varied at various times. At the time the transactions involved in this matter occurred, the margin requirement was twenty (20%) per cent. 12 C.F.R. § 221.4 (1968). The burden of observing the margin requirement is on the lender.

Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (D.C.N.Y.1968), affirmed 2 Cir., 409 F.2d 1360, Cert. denied 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180.

§ 78cc(b), Title 15 U.S.C.A., provides, in part, as follows:

"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract * * * heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who,

in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation * * *."

Section 221.1(a) of Regulation U provides in part:

"(a) Purpose credit secured by stock. No bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a national securities exchange—in an amount exceeding the maximum loan value of the collateral as prescribed from time to time for stocks in 221.-4—." 12 C.F.R. 221.1(a) (1968).

Section 221.3(b) provides in part that:

"(b) Purpose of a credit. The 'purpose of a credit' is determined by substance rather than form.

(1) Credit which is for the purpose, whether immediate, incidental, or ultimate, of purchasing or carrying a margin stock is 'purpose credit' despite any temporary application of funds otherwise.

(2) Credit to enable the customer to reduce or retire indebtedness which was originally incurred to purchase a margin stock is for the purpose of "carrying" such a security * * *." 12 C.F.R. § 221.3(b) (1) (2) (1968).

Section 221.3(a) of Regulation U provides, in part:

"(a) Required statement as to stock secured credit—An extension of credit executed by the customer if accepted in good faith. To accept the customer's statement in good faith, the officer must (1) be alert to the circumstances surrounding the credit and (2) if he has any information which would cause a prudent man not to accept the

statement without inquiry, have investigated and be satisfied that the customer's statement is truthful. 12 C.F.R. § 221.3(a) (1968).

■ The Security Exchange Act does not contain a provision which specifically provides for a private cause of action for an alleged violation of the Regulations promulgated by the Board of Governors of the Federal Reserve System relating to margin requirements. This Court holds that such a private cause of action is to be implied. Serzysko v. Chase Manhattan Bank, supra, 290 F.Supp. at 78; (And cases cited therein); Remer v. Clayton Securities Corporation, 81 F.Supp. 1014 (D.C.Mass. 1949); Pearlstein v. Scudder & German, 429 F.2d 1136, 1140 (2nd Cir. 1970).

In the case before this Court, plaintiff is an attorney and has been a member of the Michigan State Bar since 1964. Prior to admission to the bar he worked in his father's clothing store. He also worked as an errand boy, camp counselor and investigator for a personal injury law firm. He is presently associated with a law firm which basically deals with personal injury work. He testified that neither his schooling nor his work have brought him into contact with the Securities Exchange Act of 1934 or Regulation U.

Prior to 1967 his banking business consisted of a checking account with Manufacturers National Bank, in Detroit, and small personal loans for the purchase of cars and a boat. Prior to the transactions involved in this suit plaintiff had only been involved in the stock market sometime between 1959 and 1961 when he purchased a few hundred dollars worth of stock through Mr. Harold Rossen, a friend, at the brokerage house of Bache and Company, in Detroit, Michigan.

In 1967 plaintiff was told by his father-in-law that he was selling his company to Lehigh Valley Industries. At this time Bache was recommending Lehigh Valley Industries. Armed with this inside information, in January 1968 plaintiff discussed with a Mr. Hermilin the purchase of 5,000 shares of Lehigh stock. Plaintiff thought he could borrow 50 to 60% of the purchase price of this stock from Manufacturers National Bank. The remainder of the purchase price was to be put up by Mr. Hermilin. An order for 5,000 shares was placed with Mr. Rossen at Bache.

On February 13, 1968, Mr. Gmeiner at the Manufacturers National Bank was contacted by the plaintiff. Mr. Gmeiner testified that:

"I told him [plaintiff] that I couldn't make the loan for two reasons: Bank policy was one, and I said a federal regulation that wouldn't allow that much money, if bank policy would allow it." Tr. 1107.

Mr. Gmeiner's normal practice in situations of this type was to use the exact phrase "Regulation U." He was not sure if he used that exact term but he remembers definitely talking about a federal regulation with the plaintiff.

Plaintiff next contacted Mr. Wert at the National Bank of Detroit. Plaintiff was told that the bank could only loan 20% of the purchase price of the stock. Mr. Wert testified that sometime prior to March, 1969 he discussed Regulation U with the plaintiff. Tr. 1090.

Still on February 13, 1968, plaintiff contacted Mr. Walter McMurtry, a loan officer, at the Bank of the Commonwealth. Plaintiff testified that he told Mr. McMurtry that he needed money to purchase some stock. Plaintiff was friendly with Mr. McMurtry as the result of past transactions. Mr. Hermilin testified that he heard plaintiff's half of this telephone conversation and that Mr. McMurtry was told that the money was needed for the purchase of stock. Tr. 690–692.

At this point plaintiff went to see Mr. McMurtry. On the way to his office he picked up a financial statement from the Manufacturers National Bank. The financial statement was dated January 15, 1968, and it appeared to be the origi-

nal Exhibit 18A. Subsequently another financial statement was produced by the Manufacturers National Bank, which was also dated January 15, 1968. Exhibit 18D.

Mr. McMurtry testified at that time that he did not have a complete understanding of Regulation U but that he had explained Regulation U to plaintiff to the extent that the bank "could only loan him X amount of money on any stock". Tr. 798, 839, 873. Mr. McMurtry agreed to make a loan of $38,500.00 secured by the 5,000 shares of Lehigh stock but stated that it was necessary for the stock to be "free and clear" to proceed with the transaction. Plaintiff was told to write out a personal check for the stock and have the stock delivered to the Bank and then at that point the Bank would fund his account. Tr. 48–49.

Bache and Company accepted the plaintiff's personal check for $38,500.00 and a cashier's check for $28,000.00, which plaintiff had gotten by cashing the check given him by Mr. Hermilin. The stock was delivered by Bache to the bank, and at that point plaintiff's personal account was funded.

Plaintiff was informed by Mr. McMurtry that it was expected that he would transfer his business to the bank and to seek new customers for the bank. Mr. Hermilin and others were brought to the bank by plaintiff. Tr. 693–695.

Mr. McMurtry testified that he believed the proceeds of the loan were to be used in connection with the purchase of plaintiff's house. He reached this conclusion because this is what plaintiff told him, and this is what was indicated on the U–1 form, which form is to indicate the purpose of the loan. This form was not completed until February 21, 1968. Mr. McMurtry also relied upon the financial statement which plaintiff gave him on the 13th. Exhibit 18A.

Mr. McMurtry did not ask plaintiff from where the stock was coming. (He did know that stock involved in subsequent transactions came directly from Bache.) He knew that plaintiff had held the stock for under six months but he did not check with Bache as to the exact amount of time. He did not check out the date on the stock certificates. Tr. 847–854.

Following the February 13th transaction numerous other loans were made. Mr. Ross, another loan officer of the bank, became involved in the transactions and after Mr. McMurtry was no longer in the service of the bank, Mr. Ross dealt directly with plaintiff. The loans which occurred were made to plaintiff individually and to plaintiff and Mr. Hermilin, jointly. They occurred on: March 12, 1968, $63,500.00 (original loan consolidated); April 15, 1968, $60,000.00; May 13, 1968, $30,000.00; May 16, 1968, $27,000.00; May 29, 1968, $27,000.00; June 7, 1968, $73,800.00; June 14, 1968, $44,450.00; July 18, 1968, $75,000.00; July 24, 1968, $215,750.00; and August 9, 1968, $168,000.00. Most of these loans were secured by Lehigh Valley securities but on occasion the loans were secured by Continental Capital stock or Duncan Electric stock.

Based on a study of the individual transactions a definite pattern is seen to have developed. Plaintiff would come to the bank and purchase a cashier's check with his personal check. He would obtain the cashier's check on the Mezzanine floor of the bank which was not the usual place for such a transaction. The girls who issued the cashier's check were instructed by Mr. Ross and Mr. McMurtry and other bank supervisory personnel that plaintiff was a preferred customer and to issue him the cashier's check. Usual banking practices were ignored. For example plaintiff's checks were not verified and there was no hold placed on the funds of plaintiff. Usually the personal checks were held until the loan was secured and deposited to cover the personal checks. Tr. 611–12, 615–16. In a few instances the checks were not held and huge overdrafts were created in plaintiffs account. Exhibit 1.

Plaintiff would then endorse the checks to Bache and Company and the

stock would be delivered by Bache to the bank. Upon receipt of the stock the bank would proceed with the loan and plaintiff's personal account would be funded and the checks he had written would be covered.

In many instances plaintiff and Mr. Hermilin would sign blank U–1 forms and they would be subsequently filled in. There was no U–1 form for the loan of June 7, and none of the forms indicate that the purposes of the loans were to purchase stock. Most of the forms indicated that the purposes of the loans were to purchase land in Canada.

Plaintiff takes the position that the bank knew that stock was being purchased or that "[t]he circumstances surrounding plaintiff's banking transactions with defendants was such as to require it to make some investigation as to the use which plaintiff was making of the loan proceeds."

As already noted there is a requirement of "good faith" on the part of the Bank in determining the purpose of the loan. 12 C.F.R. § 221.110(b) (1); provides in part that:

> "* * * Indeed, 'the fact that a loan made on the borrower's signature only, for example, becomes secured by registered stock shortly after the disbursement of the loan affords reasonable grounds for questioning whether the bank was entitled to rely upon the borrower's statement as to the purpose of the loan."

The Court finds that the following occurred: (1) the bank did not always have the U–1 forms filled out on the date of the transactions; (2) the bank had a somewhat inexperienced loan officer (Mr. McMurtry) handling some of the transactions; (3) the loans became secured by registered stock shortly after the money was released; (4) the bank did not check with the plaintiff as to specifically how long he had owned the stock; (5) the bank's cashier's checks were endorsed to Bache and Company, a brokerage firm; (6) Bache and Company delivered directly to the bank the stock used to secure the loans; and (7) Mr. Ross was specifically told by Mr. Hermilin that land was not being purchased in Canada. Tr. 769.

Mr. Skaar a Vice President in the loan review area testified that he had reviewed the files and that there were no details of the transactions therein. It was and is his feeling that the bank was dealing with a dishonest man, that Regulation U was being violated, and that stock was being purchased with the proceeds of the loan. Tr. 1142, 1155, 1193.

12 C.F.R. § 221.101(c) (1968) provides, in part, that:

> "The requirement of 'good faith' is of vital importance here. Its application will necessarily vary with the facts of the particular case, but it is clear that the bank must be alert to the circumstances surrounding the loan. For example, if the loan is to be made to a customer who is not a broker or dealer in securities, but such a broker or dealer is to deliver registered stocks to secure the loan or is to receive the proceeds of the loan, the bank would be put on notice that the loan would probably be subject to this part. It could not accept in good faith a statement to the contrary without obtaining a reliable and satisfactory explanation of the situation."

This same test is set forth in the regulations in determining whether the bank may rely in "good faith" on the statement of purpose set forth in the U–1 form 12 C.F.R. § 221.106(c) (e) (g). On more than one occasion blank forms were submitted and not filled in until the loan had been completed.

During the course of the trial plaintiff has failed to prove to this Court by a preponderance of the evidence that, at the time the loans were being made that Mr. McMurtry or Mr. Ross or anyone at the Bank of the Commonwealth had actual knowledge of the facts by reason of which they, or either of them, should have known that Regulation U was being violated.

We are dealing in this case with a lawyer and a well educated individual. He impressed this Court as being very smooth and very glib. During the course of the transactions he became friendly with the loan officers at the bank. Mr. McMurtry and plaintiff played paddleball together. Both Mr. McMurtry and Mr. Ross had lunch with plaintiff, and their families would get together socially.[2]

In August, 1969 plaintiff phoned Mr. McMurtry, who at that time was no longer employed by the bank, and Mr. Ross. Conversations about the transactions and Regulation U ensued. Without the consent of either Mr. McMurtry or Mr. Ross the plaintiff recorded the telephone conversations. Tr. 880–896, 898. The Court finds this to be a most distasteful practice in which to engage. Mr. Ross testified that plaintiff attempted to intimidate him during a recess in the present trial by referring to the tapes of the phone conversations. Tr. 930–932. The Court believes that the practices which the plaintiff chose to engage in are not a credit to him as an individual, nor to the legal profession.

With respect to the plaintiff and what knowledge he had and what actions he took, the Court makes the following findings of fact: (1) Plaintiff is a well educated individual; (2) Plaintiff was informed by Mr. Gmeiner of the Manufacturers National Bank that a federal regulation would not allow the bank to loan him 50–60% of the purchase price of some stock; (3) Plaintiff was told by Mr. Wert of the National Bank of Detroit that the bank could only loan 20% of the purchase price of some stock; (4) Plaintiff knowingly did not put down the true purposes of the loans on the U–1 forms that he filled out; (5) Plaintiff told Mr. Skaar in July, 1969 that there was no Regulation U violation and that the money was used to purchase land (Tr. 1154); and in July, 1969 plaintiff told Mr. Grant, a vice-president at the bank, that the money had been used to purchase land.

With respect to the credibility of the plaintiff, the Court again notes the incidents having to do with the tapes and plaintiff approaching Mr. Ross during the course of the trial. The Court also notes the plaintiff seemed very interested in making some quick money as he attempted to make a profit on the difference between the United States and Canadian exchange rates.[3] In addition the Court did not find plaintiff's explanation of why there were two financial statements from the Manufacturers Bank satisfactory.

Based on the foregoing, it is the finding of this Court that Regulation U was not observed. It is further the finding of this Court that plaintiff participated in the transactions with the knowledge that they were improper and in violation of the law. It is further the finding of this Court that the plaintiff

2. Tr. 43, 81, 100, 197, 286, 288, 359, 393.

3. On cross-examination, plaintiff testified regarding a series of transactions involving his tendering his personal check to the defendant bank drawn on an account in another bank and receiving cash from Defendant bank which plaintiff would take from Detroit to Windsor where he would give the American funds to his uncle in exchange for Canadian funds which plaintiff would bring back to Detroit and deposit in his account in the bank on which his check was drawn. There were Seventy-Five ($75.00) Dollars or Eighty ($80.00) Dollars extra obtained each time through the exchange of funds which plaintiff pocketed. Usually, his checking account would not have sufficient funds to cover the check drawn until the Canadian money was deposited. On one occasion, according to plaintiff, Otto Ross of defendant bank told him that a teller had called the other bank and learned of the insufficiency of the funds in the account. According to plaintiff, Mr. Ross told him, "Marty,—don't—don't do it anymore —don't make waves." Tr. 361. Plaintiff thereupon ceased the practice. It was not indicated by plaintiff whether his uncle was exchanging the funds at the official rate, or what motive the uncle may have had for engaging in this practice which enriched the plaintiff, except to say, "I don't know, maybe it was his wife's money." Tr. 363.

attempted to and succeeded in deceiving the bank which resulted in a violation of the Regulations.

This Court is of the view that the facts of the case at bar bear a marked similarity to the factual situation encountered in Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (D.C.S.D.N.Y., 1968), affirmed 409 F.2d 1360 certiorari denied 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 with two important exceptions:

First, the Court believes and finds as a fact that Plaintiff Goldman intentionally engaged in an affirmative course of deceitful conduct with respect to his dealings with Defendant's employees for the purpose of inducing Defendant to make him loans which Plaintiff knew would be in violation of the Securities and Exchange Act and Regulation U. In *Serzysko*, the Court merely found that Plaintiff therein was a sophisticated investor whose overall conduct could be weighed in the balance in determining whether to grant him relief. The Court did not find Plaintiff guilty of affirmative deceitful action as the Court does in this case. The Court in *Serzysko* nevertheless denied Plaintiff judgment on his complaint.

Second, Defendant Bank in *Serzysko* had already sold off the collateral pledged by the Plaintiff. This left a claimed balance of $12,749.49. The Court denied Defendant bank a judgment for the deficiency while at the same time denying Plaintiff's demand that the bank purchase like securities in the market and return his collateral in kind, or failing that, in cash representing their highest intermediate market value. In the case at bar Defendant Bank still holds the pledged securities.

This Court is convinced of the correctness of the legal principles enunciated in *Serzysko* and is further convinced that the result reached by Judge Graven, in effect to leave the parties in the position the Court found them, was a just result on the facts of that case, where the claimed deficiency in the bank's favor was only $12,749.49, without regard to any possible different valuation of the securities that would be required if the Defendant Bank were to be found to have assumed the risk of selling the securities at the time and for the price it did, rather than at some other time at a price more favorable to Plaintiff.

In the case at bar, this Court is of the opinion that a just result requires that the parties be placed, to the extent possible, in the position they were prior to the transactions complained of, rather than to be left in the position the Court finds them. This just result is predicated on the Court's assessment of Plaintiff's conduct as mentioned above, as well as its finding that the prohibitions embodied in the Securities and Exchange Act and Regulation U have in fact been violated and that Defendant bank cannot escape responsibility completely for the violation in spite of the intentional deceit practiced upon it by Plaintiff. This Court is of the view that the Defendant Bank of the Commonwealth in its overzealousness to attract new business, failed to adhere to sound and established banking practices as it related to Mr. Goldman. The Court is of the opinion that the result reached is justified on either of the following bases:

*First*, Plaintiff has asked in effect by the averments of his pleadings and by the inescapable posture of his representation to rescind the contract or contracts entered into between him and Defendant bank. As the cases hold, contracts subject to the Draconian language of 15 U.S.C. § 78cc(b) are nonetheless not truly "void" but more properly are "voidable" since the law in effect gives an innocent party the right to affirm or rescind. J. Cliff Rahel & Co. v. Roper, 186 Neb. 34, 180 N.W.2d 682 (1970); Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967); Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962). It is virtual hornbook law that rescission of a contract requires the parties to place each other as nearly

as may be in *statu quo ante*. Jewett v. Petit, 4 Mich. 508 (1857). McIntosh v. Fixel, 297 Mich. 331, 297 N.W. 512 (1941); Vol. 6, Michigan Law and Practice, "Contracts" § 226. The Court acknowledges that it is guided in its decision to rescind as much by consideration of equities favoring Defendant as by equities, if any, favoring Plaintiff, but it understands recission to be in the first instance an equitable kind of remedy.

*Second*, if the Court were to enter an order denying Plaintiff judgment on his complaint and denying Defendant judgment on the contractual cause of action laid forth in its counterclaim, the Court would then enter judgment for Defendant bank for the amount of the deficiency of the loan based upon either of two causes of action not voided by 15 U.S.C. 78cc(b), namely (1) a cause of action for money lent (see 28 U.S.C.A. Federal Rules of Civil Procedure, Official Form 6, Complaint for Money Lent, and Volume 2A, Moore's Federal Practice, Second Edition, Paragraph 8.16, page 1722, footnote 1, indicating that this cause of action exists independently of any explicit oral or written contract between Plaintiff and Defendant) or (2) a cause of action for misrepresentation which it goes without saying is not a cause of action founded on contract.

Having entered a money judgment in Defendant bank's favor, levy could then be made upon the collateral, although the Court would have voided the security interest of Defendant in the collateral as required by 15 U.S.C. 78cc(b).

In light of the foregoing, and in order to effect the judgment of this Court that the contract or contracts existing between Plaintiff and Defendant be rescinded, IT IS ORDERED that Plaintiff shall within twenty days of the entry of this Opinion file an election with the Court regarding the following:

1.  Plaintiff may elect to receive back the securities held by Defendant bank upon payment to Defendant within seven days of filing his election of a sum of cash equal to the market value of securities as of the date of Plaintiff's election or of the date of tendering payment, whichever is lower. If no readily ascertainable market value can be ascribed to the securities, the parties may agree privately on a means of valuation or may apply to the Court for aid.

2.  Plaintiff may elect not to receive back the securities held by Defendant bank and shall be deemed to have done so if no election to receive back is filed within twenty days, or if election is timely filed but payment is not made within seven days thereafter. In that event Defendant bank shall be deemed to have full title to the said securities and shall forthwith apply as an offset to the claimed deficiency of Plaintiff's loans the value which the said securities attained on the date herein referred to when Plaintiff's election not to receive back the securities became final.

Following the election heretofore set forth, Defendant bank shall file a proposed judgment with the Court for the balance due of moneys lent to Plaintiff. This balance shall reflect any offset engendered by Plaintiff's election and shall *not* reflect any sum added to the actual money proceeds of the loan or loans to Plaintiff whether in the nature of interest, discount, or otherwise.

It is so ordered.