Martin R. GOLDMAN, Plaintiff-Appellant,

v.

BANK OF the COMMONWEALTH, a Michigan Banking corporation, Defendant-Appellee.

No. 72–1105.

United States Court of Appeals, Sixth Circuit.

Sept. 22, 1972.

Michael B. Lewiston, for plaintiff-appellant; Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., on brief.

Wm. H. Merrill, Detroit, Mich., for defendant-appellee; Hammond, Ziegelman, Tennent, Merrill & Sotiroff, Detroit, Mich., on brief.

Before WEICK and CELEBREZZE, Circuit Judges and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

Appellant Goldman filed suit in the District Court against Bank of the Commonwealth (Bank) to declare void loans made to him individually and loans made to one Hermelin and him jointly, over a period of six months, totaling about $661,000, on which there was a balance due of $591,000. Goldman alleged that the Bank was a member of the Federal Reserve System, and was bound by its Regulations; that the bank loans violated Regulation U (12 C.F.R. § 221 (1968)) promulgated by the Board of Governors of the Federal Reserve System pursuant to Section 7(a) of the Securities Exchange Act of 1934 because said loans were made for the purpose of purchasing registered securities and the amounts loaned exceeded 20% of the market value of said securities.

Goldman also sought to recover the value of the securities at their highest market value during the period of the loans, which securities had been pledged to the Bank as collateral security for payment of the loans and had declined considerably in value after the loans were made. Goldman's complaint contained a count alleging that the interest charged by the Bank was usurious under Michigan law.

Jurisdiction of the Court was based upon the Securities Exchange Act of 1934. 15 U.S.C. § 78aa.

The Bank answered the complaint denying that the loans were made for purposes of purchasing registered securities, and denied that it violated Regulation U. It filed a counterclaim against Goldman seeking to recover judgment on the promissory notes. Its counterclaim contained a count in tort to recover damages resulting from Goldman's furnishing to it of a false financial statement on which it relied in making the loans. The counterclaim contained a count for money loaned. The Bank alleged that Goldman practiced fraud and deceit upon it by falsely representing to it the purpose of the loans, representing that the purpose of the first loan was to obtain additional funds for the purchase of his home and its furnishings, and that the other loans were to purchase real estate in Toronto, Canada; that Goldman also made other misrepresentations to the Bank, such as false written statements as to his ownership of stock, which statements were placed in the Bank's loan files; that Goldman had actual knowledge that his loans violated Regulation U; and that Goldman wrote checks in large amounts against his checking account with the Bank, without having sufficient funds in the account for payment thereof.

The case was tried on its merits before District Judge Damon J. Keith. The testimony of the witnesses was sharply in conflict, but the District Judge, who saw the witnesses, observed

their demeanor, and heard them testify, resolved the conflicting evidence in favor of the Bank. He found that plaintiff was not a credible witness.

In its opinion and order, 332 F.Supp. 699, the Court found that the loans did violate Regulation U but that Goldman had practiced a fraud upon the Bank and had deceived it by misrepresenting the purpose of the loans and by other fraudulent conduct.

The Court treated plaintiff's action as one to rescind, and held that the parties should be restored to the status quo.

The Court allowed the Bank to recover only for actual money loaned, and without interest, giving credit to Goldman on the loans for the value of the pledged securities. Goldman appealed. We affirm.

This case presents a sorry spectacle of an attorney-at-law, admitted to practice in Michigan in 1964, borrowing from a bank large sums of money to get rich quick by investing in shares of the common stock of a corporation in which his father-in-law was interested. He represented to the bank that the loans were for other purposes. When the stock market declined, the shares were of little value and the time to pay arrived, he endeavored to avoid payment of his indebtedness and attempted even to recover the value of the shares pledged as collateral with the bank, claiming that the loans were illegal.

Goldman's father-in-law was the owner of a corporation doing business in Detroit under the name of Riverside Industries Company. The father-in-law advised Goldman that he was selling his business to Lehigh Valley Industries, Inc., the shares of which corporation were registered on the New York Stock Exchange. The father-in-law told Goldman that Lehigh had a "tremendous potential", and that he (the father-in-law)

would receive securities as part of the consideration for his sale.

Armed with this inside information before the transaction had become public information, Goldman endeavored unsuccessfully to persuade his friend, David Hermilin, to advance $100,000 to purchase on the market common shares of Lehigh, under an arrangement whereby they would share equally any profit or loss. He did, however, persuade his law partners to purchase 10,000 shares of Lehigh through a Chicago brokerage house, under the same type of arrangement which he proposed to Hermilin, namely, that Goldman would receive one-half of the profit without putting up any money, and would share one-half of any loss.

Goldman then ordered 5,000 shares of the stock from his brokers, Bache & Co., with whom he had a margin account, at a cost of about $65,000. He arranged with his friend Hermilin to put up $28,000, and endeavored to borrow the balance of about $38,500 from Manufacturers National Bank of Detroit. Clarence Gmeiner, an officer of the bank, advised him as follows:

> "I told him [Goldman] that I couldn't make the loan for two reasons: Bank policy was one, and I said a *federal regulation* that wouldn't allow that much money, if bank policy would allow it." [1] (Emphasis added)

After being turned down by Manufacturers National Bank, Goldman contacted his high school friend Wert, who was employed by the National Bank of Detroit, and was advised that the bank could loan only twenty per cent of the value of the stock.

Goldman then contacted another friend, Walter McMurtry, who was a loan officer of Commonwealth Bank. He did not tell McMurtry that he had been turned down by the other two

---

[1]. The Court questioned Goldman as to this conversation and he replied as follows:

"The Court: There was no mention of Regulation U at this point?

"The Witness: Not that I could—it —it—if he said policy or—Regulation —I—I can't really tell you, but no explanation at all of it."

banks. He arranged with McMurtry for a loan of $38,500, to be secured by a pledge of 5,000 shares of Lehigh common stock. He also furnished a financial statement, which he had given to the Manufacturers National Bank. McMurtry testified that Goldman told him that the proceeds of the loan were to be used to assist in the purchase of a house. Goldman signed a Regulation U form, stating that the proceeds of the loan were to be used to assist in the purchase of a home. Goldman testified, however, that he hold McMurtry that the loan was for the purpose of purchasing stock. McMurtry also testified that he told Goldman that the stock to be pledged as collateral for the loan had to be "free and clear". McMurtry had understood that Goldman could borrow collateral from either his father-in-law or other parties.

The Court made findings as to the loans as appears in footnote 2.

2. "Mr. McMurtry testified at that time that he did not have a complete understanding of Regulation U but that he had explained Regulation U to plaintiff to the extent that the bank 'could only loan him X amount of money on any stock'. Tr. 798, 839, 873. Mr. McMurtry agreed to make a loan of $38,500.00 secured by the 5,000 shares of Lehigh stock but stated that it was necessary for the stock to be 'free and clear' to process with the transaction. Plaintiff was told to write out a personal check for the stock and have the stock delivered to the Bank and then at that point the Bank would fund his account Tr. 48–49.

"Bache and Company accepted the plaintiff's personal check for $38,500.00 and a cashier's check for $28,000.00, which plaintiff had gotten by cashing the check given him by Mr. Hermilin. The stock was delivered by Bache to the bank, and at that point plaintiff's personal account was funded.

"Plaintiff was informed by Mr. McMurtry that it was expected that he would transfer his business to the bank and to seek new customers for the bank. Mr. Hermilin and others were brought to the bank by plaintiff. Tr. 693–695.

"Mr. McMurtry testified that he believed the proceeds of the loan were to be used in connection with the purchase of plaintiff's house. He reached this conclusion because this is what plaintiff told him, and this is what was indicated on the U–1 form, which form is to indicate the purpose of the loan. This form was not completed until February 21, 1968. Mr. McMurtry also relied upon the financial statement which plaintiff gave him on the 13th. Exhibit 18A.

"Mr. McMurtry did not ask plaintiff from where the stock was coming. (He did know that stock involved in subsequent transactions came directly from Bache.) He knew that plaintiff had held the stock for under six months but he did not check with Bache as to exact amount of time. He did not check out the date on the stock certificates. Tr. 847–854.

"Following the February 13th transaction numerous other loans were made. Mr. Ross, another loan officer of the bank, became involved in the transactions and after Mr. McMurtry was no longer in the service of the bank, Mr. Ross dealt directly with plaintiff. The loans which occurred were made to plaintiff individually and to plaintiff and Mr. Hermilin, jointly. They occurred on: March 12, 1968, $63,500.00 (original loan consolidated); April 15, 1968, $60,000.00; May 13, 1968, $30,000.00; May 16, 1968, $27,000.00; May 29, 1968, $27,000.00; June 7, 1968, $73,800.00; June 14, 1968, $44,450.00; July 18, 1968, $75,000.00; July 24, 1968, $215,750.00; August 9, 1968, $168,000.00. Most of these loans were secured by Lehigh Valley securities but on occasion the loans were secured by Continental Capital stock or Duncan Electric stock.

"Based on a study of the individual transactions a definite pattern is seen to have developed. Plaintiff would come to the bank and purchase a cashier's check with his personal check. He would obtain the cashier's check on the Mezzanine floor of the bank which was not the usual place for such a transaction. The girls who issued the cashier's check were instructed by Mr. Ross and Mr. McMurtry and other bank supervisory personnel that plaintiff was a preferred customer and to issue him the cashier's check. Usual banking practices were ignored. For example plaintiff's checks were not verified and there was no hold placed on the funds of plaintiff. Usually the personal checks were held until the loan was secured and deposited to cover the personal checks. Tr. 611–12, 615–16. In a few

Not all of the proceeds of the loans were used to purchase shares of stock. On March 12, 1968, a loan was made in the amount of $25,000, secured by 500 shares of Continental Capital stock which Goldman had purchased in December, 1967, with funds which he had withdrawn from his law firm. The proceeds of that $25,000-loan were deposited in the law firm's account. On May 13, 1968, a $30,000-loan was made, secured by the same 500 shares previously pledged on the $25,000-loan which had been paid. The proceeds of this $30,000-loan were paid to Goldman. These two loans did not violate Regulation U.

Both McMurtry and Ross testified that they had explained Regulation U to Goldman. They also testified that Goldman told them that the purposes of the loans other than the first one, were to buy land in Canada. Vice Presidents Grant and Skaar testified that Goldman later told each of them the same thing.

During the six months' period when the loans were being made Goldman purchased from the Bank sixty cashier's checks (for other purposes) totaling more than $1,800,000, with checks drawn on his personal accounts which at the time did not have sufficient funds therein to cover, but which he later made good.

Goldman also had transactions dealing with Canadian currency, to make a profit on the difference between United States and Canadian exchange rates. He obtained cash for this purpose from the defendant bank by cashing a check drawn on his personal account in the National Bank of Detroit, which account at the time did not have sufficient funds to cover. Upon cashing his check he would take the United States currency on the same day to Canada and acquire Canadian currency. He would then return to Detroit with the Canadian currency, deposit it in his checking account in the National Bank of Detroit, and thus make good his NSF check which he had previously given to the defendant bank. When the defendant bank later learned of these occurrences, Goldman was told by Ross to stop them.

In the summer of 1969, when the Bank was pressing him for payment of the loans, Goldman engaged in day trading on the stock market, hoping to recoup his losses. He drew a check on the Bank for $293,000, payable to Bache & Co. to purchase stock in Natomas Company, without having sufficient funds in the Bank to pay it. Then he wrote a check payable to the Bank drawn on his checking account in National Bank of Detroit, for $293,000 to cover his overdraft. He then stopped payment on the

instances the checks were not held and huge overdrafts were created in plaintiff's account. Exhibit 1.

"Plaintiff would then endorse the checks to Bache and Company and the stock would be delivered by Bache to the bank. Upon receipt of the stock the bank would proceed with the loan and plaintiff's personal account would be funded and the checks he had written would be covered.

"In many instances plaintiff and Mr. Hermilin would sign blank U-1 forms and they would be subsequently filled in. There was no U-1 form for the loan of June 7 and none of the forms indicate that the purposes of the loans were to purchase stock. Most of the forms indicated that the purposes of the loans were to purchase land in Canada." (App. 44-46)

"The Court finds that the following occurred: (1) the bank did not always have the U-1 forms filled out on the date of the transactions; (2) the bank had a somewhat inexperienced loan officer (Mr. McMurtry) handling some of the transactions; (3) the loans became secured by registered stock shortly after the money was released; (4) the bank did not check with plaintiff as to specifically how long he had owned the stock; (5) the bank's cashier's checks were endorsed to Bache and Company, a brokerage firm; (6) Bache and Company delivered directly to the bank the stock used to secure the loans; and (7) Mr. Ross was specifically told by Mr. Hermilin that land was not being purchased in Canada."

National Bank of Detroit check. It was made good, however, by his selling the stock and borrowing $97,000 from the National Bank of Detroit, pledging securities furnished by his father-in-law. The loss on the sale of the stock was $97,000.

On July 30, 1969, Goldman wrote a check drawn on the Bank, for $476,235.96, payable to Dr. Gerald Halbert, his friend in Toronto, with instructions to purchase 7500 shares of Natomas stock through the Canadian brokerage firm of Baker & Weeks. He did not have funds in the Bank to make good this check. The brokers purchased the stock and when they did not receive payment therefor, they sold it for a loss of about $127,000, which was paid through a loan secured by the father-in-law's collateral.

Referring to Goldman, the District Court stated:

"We are dealing in this case with a lawyer and a well educated individual. He impressed this Court as being very smooth and very glib. During the course of the transactions he became freindly with the loan officers at the bank. Mr. McMurtry and plaintiff played paddleball together. Both Mr. McMurtry and Mr. Ross had lunch with plaintiff, and their families would get together socially." [2a]

On one occasion Goldman and Hermilin gave to the wife of Mr. McMurtry an electric dishwasher, and on another occasion Goldman gave McMurtry a sweater.

The District Court adopted additional findings of fact as follows:

"Plaintiff knowingly did not put down the true purposes of the loans on the U–1 forms that he filled out." (49a)

\* \* \* \* \* \*

"It is further the finding of this Court that plaintiff participated in the transactions with the knowledge that they were improper and in violation of the law. It is further the finding of this Court that the plaintiff attempted to and succeeded in deceiving the bank which resulted in a violation of the Regulations." (50a)

\* \* \* \* \* \*

"First, the Court believes and finds as a fact that Plaintiff Goldman intentionally engaged in an affirmative course of deceitful conduct with respect to his dealings with Defendant's employees for the purpose of inducing Defendant to make him loans which plaintiff knew would be in violation of the Securities and Exchange Act and Regulation U." (51a)

\* \* \* \* \* \*

"During the course of the trial plaintiff has failed to prove to this Court by a preponderance of the evidence that, at the time the loans were being made that Mr. McMurtry or Mr. Ross or anyone at the Bank of the Commonwealth had actual knowledge of the facts by reason of which they, or either of them, should have known that Regulation U was being violated." (48a)

■ In our opinion, these findings of fact are supported by substantial evidence and are not clearly erroneous. They are binding on us. Rule 52, Fed. R.Civ.P. It is clear that the District Court was of the view that there was a gross imposition by Goldman on the Bank's employees. Because of the friendship of McMurtry and Ross with Goldman, they did not handle his loans according to accepted banking practices. They trusted him. Their confidence which they reposed in Goldman was misplaced.

---

2a. The District Judge was not impressed with the conduct of Goldman when, after the controversy with the bank arose, he called his friends McMurtry (who had by that time left the employ of the Bank) and Ross, on the telephone, and recorded their telephone conversations without their knowledge and consent, in an effort to secure admissions from them. In his opinion the Court said: "Mr. Ross testified that plaintiff attempted to intimidate him during a recess in the present trial by referring to the tapes."

The pertinent provisions of the statute are contained in footnote 3.

The pertinent regulations are set forth in footnote 4.

■ The Act does not provide for a private cause of action for violation of its margin requirements. The Courts have held, however, that such a cause of action is to be implied. Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y., 1968), aff'd per curiam, 409 F.2d 1360 (2d Cir. 1969), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180; Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967); Royal Air

3. 15 U.S.C. § 78g:
"(a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall, prior to October 1, 1934, and from time to time thereafter, prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security

.  .  . .
*       *       *       *       *

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—
(1) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section;
.  .  . .
"(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section."
15 U.S.C. § 78cc:
"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation
.  .  . ."

4. Section 221.1(a) of Regulation U provides in part:
"(a) Purpose credit secured by stock. No bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a national securities exchange—in an amount exceeding the maximum loan value of the collateral as prescribed from time to time for stocks in 221.4 —." 12 C.F.R. 221.1(a) (1968).
Section 221.3(b) provides in part that:
"(b) Purpose of a credit. The 'purpose of a credit' is determined by substance rather than form.
(1) Credit which is for the purpose, whether immediate, incidental, or ultimate, of purchasing or carrying a margin stock is 'purpose credit' despite any temporary application of funds otherwise.
(2) Credit to enable the customer to reduce or retire indebtedness which was originally incurred to purchase a margin stock is for the purpose of 'carrying' such a security." 12 C.F.R. § 221.3(b)(1)(2) (1968).
Section 221.3(a) of Regulation U provides, in part:
"(a) Required statement as to stock secured credit.—An extension of credit executed by the customer if accepted in good faith. To accept the customer's statement in good faith, the officer must (1) be alert to the circumstances surrounding the credit and (2) if he has any information which would cause a prudent man not to accept the statement without inquiry, have investigated and be satisfied that the customer's statement is truthful." 12 C.F.R. § 221.3(a) (1968).

Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962).

The present action is a common law action in tort to recover damages for violation of a federal statute or regulation. Common law defenses are therefore available to the defendant. It was so held in Royal Air Properties, Inc. v. Smith, *supra,* where the Court said:

"Although Congress specifically provided a civil remedy for violation of 15 U.S.C.A. § 77e in 15 U.S.C.A. § 77*l*(1), no such remedy was expressly provided for a violation of section 10(b) of the 1934 Act. Since civil liability was judicially implied, the appropriate common law defenses should be applicable. It would be inconsistent to apply these defenses to a remedy specifically provided by Congress and not to a remedy judicially inferred from an act of Congress. Since courts generally interpret statutes in the context of the common law and Congress has not specifically denied the availability of these defenses, we see no reason why the ordinary defenses of estoppel and waiver should not be applicable. The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act. See Carr v. Warner, 137 F. Supp. 611, 615 (D.Mass.1955); Nash v. J. Arthur Warner & Co., 137 F. Supp. 615, 618 (D.Mass.1955); cf. Goldenberg v. Bache & Co., 270 F.2d 675, 681 (5th Cir., 1959)." (*Id.* at 213–214).

See also Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y.1968).

In *Serzysko, supra,* the Court denied recovery to the plaintiff on his tort cause of action against the bank and denied recovery to the bank on its promissory notes. Because the District Court found that Goldman knew that the loans violated Regulation U, he ought not to be permitted to recover damages occasioned by his own wrongful acts. We agree with the District Court that under *Serzysko,* Goldman can not prevail.

We now consider whether the Bank may recover on any of the claims set forth in its counterclaim. In our opinion the Bank may not recover on the promissory notes as they were voidable and Goldman, by filing the action, elected to rescind them. *Serzysko, supra.*

The District Court treated plaintiff's action as being one to rescind the contracts. The Court stated:

"*First,* Plaintiff has asked in effect by the averments of his pleadings and by the inescapable posture of his representation to rescind the contract or contracts entered into between him and Defendant bank. As the cases hold, contracts subject to the Draconian language of 15 U.S.C. 78cc(b) are nonetheless not truly 'void' but more properly are 'voidable' since the law in effect gives an innocent party the right to affirm or rescind. J. Cliff Rahel & Co. v. Roper, 186 Neb. 34, 180 N.W.2d 682 (1970); Greater Iowa Corp. v. McLendon, 378 F.2d 783 (C.A. 8, 1967); Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (C.A. 9, 1962). It is virtual hornbook law that rescission of a contract requires the parties to place each other as nearly as may be in *statu quo ante.* Jewett v. Petit, 4 Mich. 508 (1857). McIntosh v. Fixel, 297 Mich. 331, 297 N.W. 512 (1941); Vol 6, Michigan Law and Practice, 'Contracts' § 226. The Court acknowledges that it is guided in its decision to rescind as much by consideration of equities favoring Defendant as by equities, if any, favoring Plaintiff, but it understands rescission to be in the first instance an equitable kind of remedy.

"*Second,* if the Court were to enter an order denying Plaintiff judgment on his complaint and denying Defendant judgment on the contractual cause of action laid forth in its counterclaim, the Court would then enter judgment for Defendant bank for the amount of the deficiency of the loan based upon either of two causes of ac-

tion not voided by 15 U.S.C. 78cc(b), namely (1) a cause of action for money lent (see 28 U.S.C.A., Federal Rules of Civil Procedure, Official Form 6, Complaint for Money Lent, and Volume 2A, Moore's Federal Practice, Second Edition Paragraph 8.16, page 1722, footnote 1, indicating that this cause of action exists independently of any explicit oral or written contract between Plaintiff and Defendant) or (2) a cause of action for misrepresentation which it goes without saying is not a cause of action founded on contract.

"Having entered a money judgment in Defendant bank's favor, levy could then be made upon the collateral, although the Court would have voided the security interest of Defendant in the collateral as required by 15 U.S.C. 78cc(b)."

The Courts have not particularly favored a person who seeks to avoid payment of his debts by asserting the defense of illegality. Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). See dissenting opinion of Judge Friendly in Pearlstein v. Scudder & German, 429 F.2d 1136, 1145 (2d Cir. 1970).

We do not regard the Bank as being in pari delicto with Goldman. We here are dealing with a financial institution; a source of the money which it loaned to Goldman was the deposits with it by its customer-depositors. Goldman was the aggressor in the loan transactions. He sought to get rich quick by wild speculations in stock of a company in which his father-in-law held securities, and which company had so-called "tremendous potential". The Bank collected only interest for making the loans. If the stock had gone up, as Goldman envisioned, he would have been a rich man. The Bank would not have participated in his riches, as it received only interest. Goldman's conduct in imposing on the Bank has been heretofore related. The worst that can be said about the Bank is

that it did not exercise ordinary banking procedures, which would have prevented it from being "taken".

In Restatement of the Law, "Contracts", § 604, page 1120, it is stated:

"Recovery by a Party Not in Pari Delicto:

"Where the parties to an illegal bargain, though both blameworthy, are not in pari delicto, and one of them has not been guilty of serious moral turpitude, he can repudiate the bargain, and if he has rendered any performance thereunder, recover it or its value.

Illustrations:

"1. A deposits in B, a bank, money on terms violating the banking law, as both A and B are aware. A can recover the money."

See also 17 Am.Jur.2d, "Contracts", §§ 227, 229, pages 605, 607, 608, 609.

Affirmed.