Gary **COOPER** et al., Plaintiffs,

v.

**UNION BANK**, a banking corporation, Defendant.

Civ. No. 71–343–F.

United States District Court,
C. D. California.

Feb. 12, 1973.

Howard P. Miller, of Buchalter, Nemer, Fields & Savitch, Los Angeles, Cal., for plaintiffs.

Lee J. Cohen, of Cohen, Freeman & Feldman, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

This is an action alleging a violation by the defendant Union Bank (hereinafter "Bank") of Regulation U, 12 C.F.R. § 221, promulgated by the Board of Governors of the Federal Reserve System pursuant to section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g.

Plaintiffs seek to void and cancel a promissory note dated July 16, 1969, executed in favor of defendant Bank, and two deeds of trust securing the note, and claim general damages of $250,000. Plaintiffs contend that the promissory note and its predecessors were obtained through loans made for the purpose of purchasing margin stock and secured by stock in violation of Regulation U. Jurisdiction is based upon the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

Defendant Bank denies the plaintiffs' allegations and, in a counterclaim, seeks a declaration that the promissory note which plaintiffs seek to cancel is valid and enforceable, that defendant is entitled to enforce payment of the unpaid principal balance plus interest, and to enforce the deeds of trust securing the note.

A preliminary injunction was issued by the court enjoining defendant Bank from foreclosing upon the deeds of trust pending the trial of this action.

The facts are as follows:

1. Defendant Union Bank is a corporation organized and existing under the laws of the State of California, with its principal place of business in the City of Los Angeles.

2. Plaintiffs reside in the County of Los Angeles. Plaintiff Gary Cooper died after the filing of the complaint; upon stipulation of the parties, Sharleen

Cooper as administratrix of his estate has been substituted as plaintiff in his place.

3. At all times material to this action, plaintiffs Gary Cooper (hereinafter "Cooper") and Richard A. Schulman (hereinafter "Schulman"), and one Bruce A. Kosman (hereinafter "Kosman"), not a party plaintiff in this litigation, were all attorneys at law, admitted to practice in California. Kosman was also employed by Kleiner Bell & Co., Inc. (hereinafter "Kleiner Bell"), a corporation which was a member of the New York Stock Exchange and other exchanges and is now out of business. Kosman was a registered representative and a vice president and shareholder of Kleiner Bell, and prior to 1968 had had extensive experience in the "put and call" business. The put and call business involved the sale of options to purchase and sell securities listed upon the New York and American Stock Exchanges and certain over-the-counter securities.

4. Prior to February 1968, Cooper, Schulman and Kosman (hereinafter "borrowers" or "joint venturers") formed a joint venture for the purpose of engaging in the put and call business.

5. On February 8, 1968, defendant Bank loaned to the borrowers the sum of $120,000 for the purpose of purchasing margin stocks to be used in the put and call business. Kosman arranged for the credit extension at the Bank.

6. As a practical matter, the sale of a "put" or "call" must be made through a reputable brokerage firm which in effect guarantees performance if the buyer exercises the put or call option. The securities purchased by the joint venturers were therefore maintained in an account with Kleiner Bell. Kosman handled the account under the name of Wilshire Mining Co. (hereinafter "Wilshire"). The business was to be conducted through Kleiner Bell and the borrowed funds were necessary in order to purchase the securities to back up the options sold. Stock purchased with proceeds of the credit was deposited directly in Wilshire's account with Kleiner Bell.

7. Kosman, as a registered representative, was prohibited by law and by rules of the pertinent stock exchanges from maintaining a securities account in his own name. For this reason, the Wilshire account was maintained in the names of Cooper, Schulman, and Ronald L. Rosen, Kosman's brother-in-law.

8. The Bank had previously made loans in much smaller amounts to Cooper and Kosman. Kosman knew George L. Browning (hereinafter "Browning"), a loan officer at the Bank.

9. The terms of the credit extended by the Bank to the borrowers were contained in a letter dated February 5, 1968, which stated that it would "serve as the formal loan agreement." The agreement was signed by Cooper, Schulman and Kosman on the one hand, and by Browning on the other.

10. The February 5th letter agreement provided, *inter alia*, (1) for joint and several liability; (2) that the borrowers' wives would execute continuing guarantees of their husbands' indebtedness; (3) that the borrowers would maintain an interest-free certificate of deposit with the Bank equal to 20 per cent of the outstanding balance of the loan, to be held by the Bank as partial collateral for the loan; (4) that the loan would be for a term of 11 months; and (5) that the loan would be used as working capital in the business of selling put and call options. A further provision stated that:

"The borrowers shall provide Union Bank with monthly financial statements of the 'put' and 'call' option business reflecting, among other things and in reasonable detail, option volume, securities positions, and contingent liability. In the event Bruce M. Kosman ceases to act as the primary broker for the business, the outstanding loan balance shall become immediately due and payable, notwith-

standing any provision to the contrary in any note provided for herein."

11. The Bank also obtained from each of the borrowers an executed document entitled "Security Agreement (Pledge)."

12. The loan of $120,000 was paid in full on November 20, 1968. On December 31, 1968, and on January 17, 1969, defendant Bank made additional loans to borrowers of $105,000 and $75,000, respectively, for a total of $180,000. The two loans totaling $180,000 were made for the same purpose as the earlier loan. In conjunction with the $75,000 loan of January 17, 1969, plaintiffs were again required to purchase a non-interest-bearing certificate of deposit in the amount of $20,000, as partial collateral for their indebtedness.

13. The total amount of $180,000 was due on June 30, 1969, but was not paid. On July 16, 1969, the borrowers paid $25,000 on the loan and executed a new note for $155,000. This note is the one sought to be cancelled and annulled by plaintiffs in this action. The Bank continued to hold the $20,000 certificate of deposit.

14. The $155,000 note was due on September 29, 1969. Payments of $25,000, $3,250, and $16,750 were made on September 11, September 12, and December 15, 1969, respectively.

15. When the Bank demanded additional security for payment of the obligation, the Schulmans and the Coopers executed deeds of trust on their residences in favor of the Bank dated December 19, 1969, and January 7, 1970, respectively. These trust deeds were recorded in the Los Angeles County Recorder's Office on March 9, 1970.

16. As further security for the loan, on January 13, 1970, Cooper, Schulman and Kosman executed in favor of the Bank an assignment of the proceeds of Wilshire's put and call trading account at Kleiner Bell.

17. A letter dated March 4, 1970, indicated that the trust deeds and the assignment were "[i]n consideration of [the Bank's] forebearing [*sic*] to take action upon the subject note."

18. On March 4, 1970, the principal indebtedness due the Bank was $110,000. On that date, the borrowers entered into a written agreement with the Bank providing for repayment of the balance due in four installments, with $16,000 to be paid on April 15, 1970, $25,000 on July 15, 1970, $25,000 on December 15, 1970, and $44,000 on February 1, 1971.

19. The first two payments were made when due. The last two installments, however, were not paid. Defendant Bank applied the $20,000 certificate of deposit that it had obtained from the borrowers to the unpaid principal balance. The amount of the present unpaid principal balance is $49,460.37.

20. On December 29, 1970, defendant Bank instituted action to foreclose upon the deeds of trust on the homes of the Coopers and the Schulmans. The Bank did not attempt to reach the proceeds of the margin account at Kleiner Bell, which the borrowers had assigned to it.

The questions before the court are whether the loans made by defendant Bank to the borrowers violated Regulation U; and, if so, what form of relief is appropriate.

### The Securities Exchange Act of 1934

The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (hereinafter "the Act"), was enacted in the aftermath of the 1929 stock market crash in order to regulate securities exchanges and other markets in which securities are traded. One of the major purposes of the Act was the regulation of margin credit. The term "margin" refers to the borrower's equity—the amount he must deposit in cash or in other securities, along with the purchased securities, to furnish collateral for a loan.

In order to prevent the recurrence of the stock market crash and the ensuing depression, Congress directed the Federal Reserve Board in section 7 of the Act, 15 U.S.C. § 78g, "[f]or the purpose of

preventing the excessive use of credit for the purchase or carrying of securities," to "prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security (other than an exempted security) . . . ." The congressional purpose behind the enactment of section 7 was more fully indicated in the report of the House Committee on Interstate and Foreign Commerce:

> "The main purpose of these margin provisions . . . is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a by-product of the main purpose.

> "The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be diverted by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry and agriculture, were drained by far higher rates into security loans and the New York call market." H. R. Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934).

*See* Pearlstein v. Scudder & German, 429 F.2d 1136, 1140, 1147 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S. Ct. 1250, 28 L.Ed.2d 550 (1971); Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. 677, 678–679 (D.D. C. 1971); Remar v. Clayton Securities Corp., 81 F.Supp. 1014, 1017 (D.Mass. 1949); Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum. L. Rev. 1462, 1468 (1966).

## *The Board's Margin Regulations G, T and U*

The Federal Reserve Board responded to the congressional mandate by enacting three regulations governing the extension of credit in connection with the purchase of stocks on margin. Paragraph (c) of section 7, 15 U.S.C. § 78g(c), forbids brokers or dealers who transact a business in securities to extend credit collateralized by securities, or on an unsecured basis, except in accordance with the Board's regulations. In 1934 the Board adopted Regulation T to implement this directive (Credit by Brokers and Dealers, 12 C.F.R. § 220). Paragraph (d) of section 7, 15 U.S.C. § 78g(d), authorizes the Board (with certain exceptions not relevant here) to regulate the extension of credit by any person not subject to paragraph (c) "for the purpose of purchasing or carrying any security . . . ." In 1936 the Board adopted Regulation U (Credit by Banks for the Purpose of Purchasing or Carrying Margin Stocks, 12 C.F.R. § 221) to regulate credit extended by banks, and in 1968 the Board adopted Regulation G (Securities Credit by Persons other than Banks, Brokers, or Dealers, 12 C.F.R. § 207) to regulate credit extended by persons other than banks, brokers or dealers. Regulation U is the only regulation alleged to have been violated in the present action.

The specific level of margin requirements at any time is set in the Supplements to the regulations in terms of the "maximum loan value" of stock used to secure a loan, *i. e.*, the amount of credit which a lender may extend against stock. (The "margin" is the obverse of the "maximum loan value.") At the time the loan in question was made by the Bank on December 31, 1968, the margin requirement was 80 per cent. At that time, therefore, a borrower who purchased $100 worth of margin stock could borrow $20 against that stock and needed to deposit $80 in cash or other collateral with the lender.

Credit extended by a bank is not subject to Regulation U unless it meets three conditions. The first is that the credit be for the purpose of purchasing or carrying margin stock (a term of art describing principally stocks registered on national securities exchanges or appearing on a list of over-the-counter stocks published by the Board, 12 C.F.R. § 221.3(v)). The second condition is that the credit be secured, directly or indirectly, by *some* stock (whether or not margin stock). The third is that the amount of the loan exceed the maximum loan value of the stock securing the loan. Section 221.1(a) of Regulation U provides, in relevant part, that:

> "(a) *Purpose credit secured by stock.* (1) . . . [N]o bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in § 221.4 (the Supplement to Regulation U) . . . ."

Unlike a broker or dealer, a bank may extend unsecured credit to purchase or carry margin stock. For this reason, it would be possible to evade the margin requirements of Regulation U if a bank could make two "purpose" loans, one secured by stock and the other unsecured, to the same borrower. To prevent such evasion, section 221.1(d) of Regulation U, the "[s]ingle credit rule," provides that

> "the entire amount of the purpose credit extended to any customer by any bank at any time shall be considered a single credit; and all the collateral securing such credit shall be considered in determining whether or not the credit complies with this part."

All the loans made by the Bank to the borrowers in this case were for the purpose of establishing and maintaining the borrowers' put and call business, and are therefore considered as a unit under the single credit rule.

It would also be possible for a bank to evade Regulation U by extending credit in an unsecured form, even though the bank was actually looking to stock of the customer as security for the loan, such as by acting as custodian for the stock or by requiring the customer to promise not to pledge the stock elsewhere. To prevent evasion of this kind, an arrangement under which a loan is indirectly secured by stock comes within the ambit of Regulation U. Section 221.3(c) of the regulation defines the term "indirectly secured" broadly (see *infra* for a more detailed discussion):

> "(c) *Indirectly secured.* The term 'indirectly secured' includes any arrangement with the customer under which the customer's right or ability to sell, pledge, or otherwise dispose of stock owned by the customer is in any way restricted so long as the credit remains outstanding, or under which the exercise of such rights, whether by written agreement or otherwise, is or may be cause for acceleration of the maturity of the credit: *Provided,* That the foregoing shall not apply (1) if such restriction arises solely by virtue of an arrangement with the customer which pertains generally to the customer's assets unless a substantial part of such assets consists of stock, or (2) if the bank in good faith has not relied upon such stock as collateral in the extension or maintenance of the particular credit . . . ."

Two provisions of Regulation U exempt certain kinds of conduct by a bank from the scope of the regulation. Sections 221.3(h) and (i) provide:

> "(h) *Mistakes in good faith.* No mistake made in good faith in connection with the extension or maintenance of a credit shall be deemed to be a violation of this part.

> "(i) *Action for bank's own protection.* Nothing in this part shall be construed as preventing a bank from taking such action as it shall deem necessary in good faith for its own protection."

Section 29(b) of the Act, 15 U.S.C. § 78cc(b), declares contracts made in violation of the Act and the regulations thereunder to be void as to the rights of the violator.

*Private Cause of Action for Violation of Regulation U*

█ The Securities Exchange Act of 1934 does not expressly provide for civil liability for violation of section 7, except for section 29(b)'s provision voiding the rights of the violator. Over the years, however, the courts have recognized the existence of implied rights of action for violation of the Act, including section 7 and the rules and regulations thereunder.

Over two decades ago, Judge Wyzanski held that a private person has a right of action to recover damages arising from a violation of Regulation U. Remar v. Clayton Securities Corp., *supra*, 81 F.Supp. at 1016–1017. In the leading Regulation U case of Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 77, 78 (S.D.N.Y. 1968), aff'd mem., 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969), the court held that "a private cause of action for violation of the margin requirements of the Act is to be implied," and also observed that "[i]t appears that the regulation places the entire burden of observing the margin requirements on the lender." The existence of a private cause of action for a violation of Regulation U was reaffirmed in Goldman v. Bank of the Commonwealth, 467 F.2d 439, 445 (6th Cir. 1972).

Many cases have held that a private cause of action is to be implied for a violation of Regulation T, relating to margin requirements for credit furnished by brokers and dealers. In Pearlstein v. Scudder & German, *supra*, the majority declared that

"[i]n our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission." 429 F.2d at 1141.

The court in In re Naftalin & Co., 333 F.Supp. 136, 144, 145 (D. Minn. 1971), in addition to noting that "[t]he necessity of putting teeth into the legislative policy of effective credit regulation in the securities industry outstrips the worth of any customer," reaffirmed that "the 'onus of compliance' with the federal regulations should be and is on the brokers and dealers, and not on their customers." Similar sentiments were voiced in Avery v. Merrill Lynch, Pierce, Fenner & Smith, *supra*:

"The Court finds that it was the clear intent of Congress to regulate excessive speculation on credit and that the means the Congress chose were the margin requirements which clearly place the onus of meeting certain minimum margin percentages on the brokers and dealers and not on their customers." 328 F.Supp. at 680.

Other cases holding that a private right of action is to be implied for a violation of Regulation T include Reader v. Hirsch & Co., 197 F.Supp. 111, 114–115 (S.D.N.Y. 1961) and Appel v. Levine, 85 F.Supp. 240, 241 (S.D.N.Y. 1948). Cf. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S. Ct. 1555, 12 L.Ed.2d 423 (1964).

The court holds that plaintiffs have a private right of action under section 7 of the Securities Exchange Act and Regulation U promulgated thereunder.

*Direct Security*

Regulation U prohibits a bank from extending credit "secured directly or indirectly by any stock" if the other conditions of the regulation are met. The parties to this action have stipulated that the loans to the borrowers were not *directly* secured by any stock in violation of Regulation U.

Under the facts of this case, it would have been impractical for the loans to

have been directly secured by the stocks purchased by the borrowers. This is because it was necessary for Kleiner Bell, the broker, to hold in its account the securities which the joint venturers purchased in the course of carrying on their put and call business, in order to secure its guarantee of the put and call options. Moreover, it was contemplated that the borrowers would purchase the securities on margin through Kleiner Bell, and this factor also necessitated that the securities be held by the brokerage firm. Thus, the Bank did not have a direct security position in the stocks purchased with the loan proceeds.

### Indirect Security

The facts show that the credit extended by defendant Bank to the borrowers was for the purpose of purchasing or carrying margin stock, and therefore met the first condition required for violation of Regulation U. The credit was in excess of the amount permitted by the then current Supplement to the regulation, and thereby met the third condition. If the loans were indirectly secured by stock, they met the second condition, and were extended in violation of Regulation U.

The court initially considers the meaning of the term "indirectly secured" contained in Regulation U. This inquiry appears to be one of first impression. No case construing the term has been called to the court's attention.

Section 221.3(c) of Regulation U defines the term "indirectly secured" broadly, to

"includ[e] any arrangement . . . under which the customer's right or ability to sell, pledge, or otherwise dispose of stock owned by the customer is in any way restricted so long as the credit remains outstanding, or under which the exercise of such rights . . . is or may be cause for acceleration of the maturity of the credit . . . . ."

The Federal Reserve Board has delineated criteria to be used to determine whether bank loans are indirectly secured by stock within the meaning of Regulation U, in sections 221.113(e), (f), and (g) of the regulation:

"(e) The Board has indicated its view that any arrangement under which stock is more readily available as security to the lending bank than to other creditors of the borrower may amount to indirect security within the meaning of this part. . . .

\* \* \* \* \* \*

"(f) A wide variety of arrangements as to collateral can be made between bank and borrower which will serve, to some extent, to protect the interest of the bank in seeing that the loan is repaid, without giving the bank a conventional direct 'security' interest in the collateral. Among such arrangements . . . are the following:

"(1) The borrower may deposit stock in the custody of the bank.

\* \* \* \* \* \*

"(2) A borrower may . . . agree not to pledge or encumber his assets elsewhere while the loan is outstanding.

\* \* \* \* \* \*

"(3) The borrower may deposit stock with a third party who agrees to hold the stock until the loan has been paid off. . . .

"(g) The three instances described above are merely illustrative. Other methods, or combinations of methods, may serve a similar purpose. The conclusion that any given arrangement constitutes 'indirect security' may, but need not, be reinforced by facts such as that the stock in question was purchased with proceeds of the loan, that the lending bank suggests or insists upon the arrangement, or that the loan would probably be subject to criticism by supervisory authorities were it not for the protective arrangement."

Taking into account the definition of "indirectly secured" contained in section 221.3(c), the criteria listed by

the Federal Reserve Board in section 221.113, and the purposes for which section 7 of the 1934 Act was enacted, the court has attempted to fashion a rule of law defining the scope of the term "indirectly secured." The court holds that in order for a loan for the purpose of purchasing or carrying margin stock *not* to be indirectly secured by stock within the meaning of Regulation U, at least two conditions must be met: (1) the borrower's use of and rights with respect to any stocks owned by him must be unfettered and not subject to any restrictions by the lending bank; and (2) the loan must not contain any provisions which give or are intended to give the lending bank a priority or advantage over any other creditors in applying any stock owned by the customer to satisfy the borrower's obligation to the bank. In determining whether these conditions are met in a particular case, such facts as whether the stock in question was purchased with the proceeds of the loan, whether the lending bank insisted upon the arrangement, and whether the loan would be subject to criticism by supervisory authorities were it not for the protective arrangement are relevant.

The use of the word "includes" in section 221.3(c) of Regulation U indicates that the scope of the definition of "indirectly secured" is not limited to the specific types of arrangements delineated therein. A particular credit must be evaluated with reference to the purposes behind Regulation U. As has been discussed above, the primary purpose of section 7 of the 1934 Act, under which Regulation U was promulgated, was to prevent excessive speculative credit transactions through the margin requirements specified by the Federal Reserve Board. The court finds that a purpose of Regulation U is to discourage banks from attempting to use any stock as a source of repayment of a loan made for the purpose of purchasing or carrying margin stocks by a customer, by ensuring that the bank may not attach any restrictions to the borrower's use of any stock and may not gain a prior security position with respect to any stock as compared to other creditors.

The court finds that the loans made by defendant Bank to the borrowers in the instant case were indirectly secured by the stock in the margin account that the borrowers maintained with Kleiner Bell, in violation of Regulation U. The loan meets both of the two conditions, either of which independently would support a finding of an indirect security, in that: (1) the borrowers' use of the stock was not unfettered but was subject to a restriction by the Bank; and (2) the Bank intended to make the stock more readily available as a source of repayment to the Bank than to other creditors of the borrowers (other than the brokerage house).

The court's finding that the loans were indirectly secured within the meaning of Regulation U is based upon documentary evidence, including the letter agreement of February 5, 1968 and internal bank memoranda, and upon the testimony of Kosman and of Browning.

The letter agreement of February 5, 1968, expressly provided for monthly accountings showing, among other things, "securities positions" in the account maintained at Kleiner Bell. This provision was intended to give the Bank current information about the holdings in the account. The Bank's constant monitoring of the securities positions in the Wilshire put and call business is one indication that the Bank looked to the stock as a source of repayment of its loans.

Another indication is provided in the Minutes of the Bank's Loan Committee from February 12, 1968, to June 27, 1969. In each of these memoranda, "liquidation of option portfolio" is listed as one of two "sources of repayment" of the loans (the other being either "income from option portfolio" or "transfer of debt").

More importantly, the February 5th letter agreement required that Kosman be the primary broker on the account, or else the loan would be immediately accelerated. The Bank has argued that its

insistence on this provision was because of Kosman's expertise in the business. The court finds, however, that the purpose of the requirement was to keep Kosman in control of the securities positions to ensure that they would be maintained as an adequate source of repayment for the bank's loans.

At the time the initial loan was made, Kosman's name could not appear on the securities account at Kleiner Bell, since he was a registered representative. Even though Kosman was not a party to the account, however, he was both broker and borrower, and was jointly and severally liable for the entire obligation. Kosman testified that the purpose of his signing the note was to ensure that he would have an interest in paying back the loan, because of his joint and several liability. He also testified that the reason for requiring him to be the primary broker on the account was that "the Bank would be protected if I was in charge of the account." The Bank knew that if Kosman signed the note and was the primary broker, he would have a self-interest in seeing that the proceeds of the loan would not be squandered, and that the stocks purchased with the borrowed funds would be available to the Bank as a source of repayment for the loans, should that prove necessary. A disinterested broker would have had neither the motive nor the means to ensure that the Bank was protected.

It is important to note that Kosman's self-interest in repayment of the loan provided protection for the Bank. For every duty, there is a right in someone else. The Bank had a right in the account and a duty owed to it by Kosman, even though that right was not one that permitted foreclosure of the assets of the account. For an indirect security to exist, no right of foreclosure is needed.

Even more telling is the testimony of Browning, the Bank's loan officer who originally approved the loan and who signed the letter agreement of February 5, 1968. In response to a question from the court as to the reason for requiring monthly reports and that Kosman be the primary broker, Browning replied that "I wanted a handle on the account." No clearer indication could be given that the Bank looked to the stocks purchased with the proceeds of the loan as an indirect form of security for the loan. The Bank wanted to be in a position to exercise a measure of control over the account (a "handle"), so that the account would be preserved as a possible source of repayment. The Bank also wanted to be in a position which would give it an advantage over other creditors with respect to the priority of its claim over the account.

In addition to the foregoing factors, all three of the facts listed in section 221.113(g) of Regulation U as tending to indicate the existence of an indirect security are present in the instant case. First, the stock in the borrowers' margin account was purchased with the proceeds of the loans. Indeed, the evidence indicates that the loan proceeds could be used *only* in the put and call business. Second, Union Bank insisted upon the protective arrangement in the letter agreement of February 5, 1968, and thereafter. And third, the Bank's insistence that the borrowers "clean up" the loan for a 30-day period after 11 months (by taking out a short-term loan at another bank) was designed solely to satisfy the California bank examiners.

The Bank contends that it looked not to the assets of the put and call operation, but solely to the net worth statements of the borrowers and to the anticipated profits expected to be derived from the put and call business, for security for its credit. The Bank argues that the combined financial statements, particularly that of Schulman, reflected assets sufficient to provide adequate security.

Schulman's financial statement was, as the Bank contends, submitted to the Bank before the loan was granted, on January 18, 1968. The statement was not received by the Bank's Credit Department, however, until February 8, 1968, three days after the loan was approved. Since no detailed credit check

was run until at least three days after the loan was approved, the court is convinced that the Bank did not rely very heavily upon the borrowers' financial statements as a basis for its decision to grant the loan. In any event, it is clear that the Bank did look to the stock purchased by the borrowers as a form of indirect security within the meaning of the regulation.

The court finds that regardless of all else, the Bank would not have made the loans without the two conditions requiring monthly statements and Kosman's role as the primary broker. While the Bank may contend that the loan was made on the basis of the plaintiffs' personal assets, the fact is that no credit would have been extended without these two conditions.

■ The Bank contends that any security interest it might have sought to obtain in the stocks in the put and call account would have been ineffective. Among other reasons, the Bank argues that "mechanically, it would have been unfeasible, if indeed impossible, for defendant Bank to have acquired and maintained any realistic security interest because of the constant movement of the stock portfolio held by plaintiffs to support their 'put and call' options." It is clear, however, that an indirect security does not have to be *effective* to violate Regulation U; it only has to *exist*. Whether or not any security interest the Bank may have had was effective is not the issue; rather, the question before this court is whether such a security interest existed.

The Bank also argues that seeking a secondary security position behind Kleiner Bell would not have made the loans more "prudent" as a matter of business judgment. Whether the Bank acted prudently in extending the loans is also not the issue. The question is whether Regulation U was violated. The regulation may well operate to place loans for the purpose of stock purchases outside normal banking procedures. Its operation does not depend upon the "prudence" of attaching certain conditions to loans.

Finally, the Bank argues that it would not have attempted to obtain an assignment of the proceeds of Wilshire's margin account, which it received in early 1970, if it already had had a security position in the account. This argument is without merit. An actual assignment provides a form of direct rather than indirect security and provides a capability of foreclosure. The Bank attempted to obtain an acknowledgment of the assignment from Kleiner Bell, since Kleiner Bell had a prior security interest, but did not receive such an acknowledgment. Coupled with the obtaining of the trust deeds on the Cooper and Schulman residences, the assignment was merely a means for the Bank to obtain additional security at a point when the borrowers had repeatedly defaulted on their obligation.

### Exculpatory Provisions of Regulation U

■ The Bank argues that even if the loans were indirectly secured by stocks, the loan transaction did not violate Regulation U because of the exculpatory provisions contained in sections 221.3(c), (h) and (i). The court finds this contention to be without merit.

Under the second proviso to section 221.3(c), *supra*, a loan is not "indirectly secured" by stock within the meaning of Regulation U "if the bank in good faith has not relied upon such stock as collateral in the extension or maintenance of the particular credit . . . ." The Bank contends that this proviso applies to it because it looked to the personal assets of the borrowers in deciding to grant the loan.

As the court has already determined, the Bank did not rely primarily on the borrowers' personal assets. More importantly, the statement by Browning that the Bank wanted a "handle" on the account eliminates entirely any good-faith defense the Bank may assert. Seeking a "handle" indicates that the Bank delib-

erately and knowingly sought, through the conditions attached to the loan, to preserve the stocks as a source of repayment for the credit and to place itself in a better position than other creditors.

There is no contention in this case, as there was in Goldman v. Bank of the Commonwealth, *supra*, and Serzysko v. Chase Manhattan Bank, *supra,* that the borrower misled the bank as to the purpose of the loans, so that the bank did not know that the loan proceeds were to be used to purchase stocks. No such fraud was present here. The Bank was fully aware that the credit was to be used for the purchase of stocks to maintain a put and call business, and indeed was aware that it would be used *only* for such a purpose.

■ Similarly, the Bank cannot avail itself of section 221.3(h), *supra*, which provides that "[n]o mistake made in good faith in connection with the extension or maintenance of a credit shall be deemed to be a violation of this part." No mistake of fact is alleged to have been made by the Bank in granting the loan; the Bank was fully aware of the facts upon which it based its decision to grant the credit. While no mistake of law is alleged to have been made (the Bank was familiar with Regulation U before the initial loan was made), such a mistake would not be a defense to a violation of Regulation U. And, as has been noted above, the element of good faith necessary for a defense under section 221.3(h) is lacking.

■ The Bank may have misinterpreted its duties and obligations under Regulation U, but that of course is not a defense to a violation. In effect, the Bank claims that it had an honest intention not to violate the regulation and therefore should be excused from compliance. The plan to obtain an indirect security was one deliberately and purposely designed by the Bank. A party cannot deliberately undertake a course of conduct which violates Regulation U, and then claim a good-faith defense. In Siano v. Helvering, 13 F.

Supp. 776, 781 (D.N.J. 1936), the court refused to apply the state of mind theory of good faith to administrative regulations of a government agency, for "[t]o do so would be . . . to render [the regulation] nugatory. This because its enforcement would, in nine cases out of ten, be possible of sterilization by the testimony of the party most interested in evading it."

■ Section 221.3(i), *supra*, provides that nothing in Regulation U "shall be construed as preventing a bank from taking such action as it shall deem necessary in good faith for its own protection." This section codifies the doctrine known in banking circles as "debt previously contracted" and may permit a bank to take action which would not otherwise have been permissible, if the action is necessary to secure repayment of credit previously extended in good faith. In the instant case, section 221.3(i) might have applied to prevent the assignment of the proceeds of the Wilshire account to the Bank, executed in early 1970, from transforming the loans into stock-secured loans, *if and only if* the loans had originally been made in good faith on a wholly unsecured basis, or in reliance upon security other than stock. As has been noted above, however, the Bank sought to obtain a "handle" on the stocks in the margin account from the outset, thereby vitiating good faith in the initial granting of the loan; and accordingly section 221.3(i) does not provide a good defense to the Bank.

### Relief

■ The court has found that the loans made by defendant Bank to the borrowers were indirectly secured by stock in violation of Regulation U. The only remaining question regards the nature of the relief to be granted.

Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), provides in part as follows:

"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereun-

der, and every contract . . . made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ."

In interpreting this provision, the courts have held that contracts subject to section 29(b) of the Act are not truly "void" but are more properly "voidable" by the innocent party. Goldman v. Bank of the Commonwealth, *supra*, 467 F.2d at 446; Greater Iowa Corp. v. McLendon, 378 F.2d 783, 792 (8th Cir. 1967); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 213 (9th Cir. 1962).

The two leading cases which have considered the question of relief for a violation of Regulation U are Serzysko v. Chase Manhattan Bank, *supra*, and Goldman v. Bank of the Commonwealth, *supra*. In both cases, the courts found that the plaintiff knowingly and intentionally deceived the bank as to the purposes for which the loan was to be used. In *Serzysko*, the court denied the plaintiff affirmative relief because of his fraud. However, the court also refused to allow the defendant bank to recover the unpaid balance of its loan, finding that the violation of Regulation U made the transaction void. (The court found that the bank failed to exercise "reasonable diligence in . . . investigating as to possible misconduct of the borrower in connection with the loan . . . ." 290 F.Supp. at 90.) In *Goldman*, the court treated the plaintiff's action as one to rescind the contract and sought to return the parties to the *status quo ante*, by denying damages to the plaintiff and allowing the bank to recover money actually lent, without interest.

In the instant case, plaintiffs have sought to void and cancel the unpaid balance of $49,460.37 on the promissory note, together with interest and other amounts that may be due, and to void and cancel and have reconveyed to them the deeds of trust on the Cooper and Schulman residences which secure the promissory note. As has been noted above, plaintiffs have not engaged in fraudulent conduct, as did the plaintiffs in *Serzysko* and *Goldman*.

The court has determined that defendant Bank violated Regulation U in extending the credit to the borrowers. The court holds that therefore the Bank's rights under the loan contract are void under section 29(b) of the Act, *supra*. Since the promissory note and the deeds of trust were obtained from the plaintiffs to secure a loan which violated Regulation U, the court orders that the unpaid balance on the promissory note, together with interest and all other sums that may be due, be voided and canceled, and plaintiffs relieved from all obligation to pay them; that the deeds of trust on the Cooper and Schulman homes be voided and canceled and reconveyed to plaintiffs; and that such reconveyance be recorded in the Office of the County Recorder of Los Angeles County.

Plaintiffs have also sought general damages of $250,000. However, plaintiffs have presented to the court no proof of any damages caused by the Bank's illegal conduct other than plaintiffs' liability to pay the unpaid balance of the promissory note and under the deeds of trust. At trial, plaintiffs with their evidence were content to void and cancel the unpaid balance of their note and the deeds of trust which secured it. Accordingly, plaintiffs shall not be entitled to any recovery other than that set forth above.

Defendant Bank in its counterclaim has sought a declaration that the promissory note is valid and enforceable,

and that defendant Bank is entitled to enforce payment of the unpaid principal amount of $49,460.37, plus interest and any other amounts due, and to enforce the deeds of trust on the Cooper and Schulman residences. The court has determined that defendant Bank violated Regulation U in extending the credit to the borrowers and that the Bank's rights under the loan contract are void under section 29(b) of the Act. Since the promissory note and the deeds of trust were obtained as security for the credit, and the credit was extended in violation of Regulation U, the Bank's counterclaim is denied.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion shall constitute the court's findings of fact and conclusions of law.

Pursuant to Rule 58, a judgment shall be entered in favor of the plaintiffs and against the defendant Bank, granting the relief requested by plaintiffs except denying any recovery for general damages.